## JENSEN–SALSBERY LABORATORIES, Inc., v. SALT LAKE STAMP CO.

Circuit Court of Appeals, Eighth Circuit.
August 24, 1928.

No. 8131.

George Y. Thorpe, of Kansas City, Mo. (Thorpe & Thorpe and Kenneth M. Thorpe, all of Kansas City, Mo., on the brief), for appellant.

100

Edwin A. Krauthoff, of Kansas City, Mo. (Alfred R. Fuchs, of Kansas City, Mo., and Irvine, Skeen & Thurman, of Salt Lake City, Utah, on the brief), for appellee.

Before LEWIS, Circuit Judge, and PHILLIPS and JOHN B. SANBORN, District Judges.

JOHN B. SANBORN, District Judge. This is a suit for an infringement of United States letters patent No. 1,447,982, issued to the appellee (hereinafter called the complainant) as assignee of Edwin F. Hennefer, the applicant for such letters, for improvements in stock-marking devices, and more particularly in ear tags. The appellant (hereinafter called the defendant) set up the usual defenses of invalidity of the patent and noninfringement. The court found for the complainant, and a decree was entered for an injunction and accounting.

The claims of the patent are as follows:

"1. An ear tag comprising an elongated metallic strip having a pointed and sharpened prong at one end, and a transversely disposed slot at the other end, said strip being adapted to be bent into loop shape and the prong passed through the said slot and clinched inwardly towards the bend of the loop, and then backwardly to form a return bend, said strip having a seat for receiving the end of the prong when so bent, said seat being spaced from the slot and having its length and width less than said slot.

"2. An ear tag comprising an elongated metallic strip having a pointed and sharpened prong at one end, and a transversely disposed slot at the other end, said strip being adapted to be bent into loop shape and the prong passed through the said slot and clinched inwardly towards the bend of the loop, and then backwardly to form a return bend, said strip having a transversely disposed slot spaced from the end slot for receiving the inwardly and backwardly directed point of the prong, said slot being shorter and narrower than the first-mentioned slot.

"3. An ear tag comprising an elongated metallic strip having a reduced end pointed and sharpened to provide an ear penetrating prong and being provided adjacent to its other end with a transversely disposed slot and a transverse seat inwardly from the outer face of the strip adjacent to the slot, said strip being adapted to be bent into a loop shape, and the prong to pass through the terminal slot at an angle and the point thereof to be curled or clinched into said seat."

It appears that an ear tag consisting of an elongated metallic strip having a pointed and sharpened prong at one end, and a transversely disposed slot at the other end, the strip being adapted to be bent into loop shape and the prong passed through the ear and through the slot, and clinched inwardly towards the bend of the loop, and then backwardly to form a return bend, was old, and was the kind of ear tag generally sold in the market at the time of the granting of the patent in suit. The complainant for many years had been engaged in manufacturing and marketing such tags. Hennefer had been in its employ in connection with the manufacture and marketing thereof. He states that, while he was so engaged, many complaints were received by the complainant from purchasers that, after these ear tags were fastened to the ears of cattle, the bent-over end of the prong would catch in brush or wire fencing and the tag would work loose, pull out, or be torn out of the ears of the animals. He states that, after much study and experimentation, he evolved the ear tag disclosed in the patent, which provided a second hole or slot into which the bent-over end of the prong was forced by the pliers in fastening the ear tag to the ear of the animal, thereby eliminating any chance of the ear tag catching in anything and thereby becoming loosened or torn from the ear; that, after this tag was evolved and placed on the market, no further complaints were made; and that the tag proved to be popular and satisfactory. It appears that the defendant was also engaged in the business of selling ear tags, among a great many other articles, and that it purchased ear tags from the complainant; that, shortly after the ear tag devised by Hennefer was placed upon the market by the complainant, the defendant began to manufacture a similar tag. It claims, however, not to have seen the complainant's improved tag prior to the time it began marketing its tags with two slots.

The only question involved in the case was whether the patent was invalid for lack of invention. The trial judge decided that it involved invention, and not mere mechanical skill, and it is his conclusion in this regard which the defendant challenges by this appeal.

The prior art patents cited by the defendant were:

Callison, 661,598, 1900, which showed an ear marker with one slot.

Davis, 912,820, 1909, which showed a poultry marker or leg band, consisting of an elongated metal strip, which was bent into a loop and through the slot, in one end of which the other end passed and was clinched in such a way that the end passing through the slot was covered by a tongue-like extension fastened to the other end.

Possner, 1,177,051, 1916, showing a paper clip consisting of an elongated metal band with one slot, operating in substantially the same manner as the one slot ear tag of Callison.

British patent to Baker, 151,419, 1920, showing an ear tag with a curved recess or transverse cylinder near the extremity of one arm, with a slot or opening in the cylinder into which the prong or tang would pass after piercing the ear of the animal, and would curl over after impinging against the bottom of the recess, "so that it is impossible to remove it from the slot or opening." This patent contains the further statement with reference to this tag or clip: "Once the clip has, therefore, been attached, it is impossible to fraudulently remove same."

The first three patents cited would no doubt defeat the patentability of the single slot ear tag. Baker more nearly approached the result sought by Hennefer, but in an entirely different way and for a different purpose. He was trying to make a tag which could not be removed. The complainant's tag can be removed, but the end cannot catch on obstacles with which cattle may come in contact. Baker provides a cylinder into which the end is clinched or turned over; Hennefer, a second slot. The improvement of Hennefer was no doubt simpler, more effective, and less expensive than that of Baker, in that it required no cylinder, but only an additional hole in the metal band. We are convinced that there was no anticipation, shown by the record in this case, of what Hennefer did, nor do we think that there is anything in the prior art cited to suggest the Hennefer ear tag.

The very simplicity of Hennefer's accomplishment creates at first an impression that Hennefer's improvement involved mechanical skill, rather than invention, but simplicity alone is not a reliable test. In Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 434, 31 S. Ct. 444, 447 (55 L. Ed. 527), Mr. Justice McKenna, speaking for the court, said with reference to the tire covered by the patent:

"It was certainly not an exact repetition of the prior art. It attained an end not attained by anything in the prior art, and has been accepted as the termination of the struggle for a completely successful tire. It possesses such amount of change from the prior art as to have received the approval of the Patent Office, and is entitled to the presumption of invention which attaches to a patent. Its simplicity should not blind us as to its character. Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, 'in the light of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer and set at defiance the speculations of inventive genius.' Pearl v. Ocean Mills [Fed. Cas. No. 10876], 11 Off. Gaz. 2. Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen, and yet was not. It regards a change as evidence of novelty; the acceptance and utility of change as a further evidence, even as demonstration; and it recognizes degrees of change, dividing inventions into primary and secondary, and, as they are, one or the other, gives a proportionate dominion to its patent grant. In other words, the invention may be broadly new, subjecting all that comes after it to tribute (Railway Co. v. Sayles, 97 U. S. 554, 556 [24 L. Ed. 1053]); it may be the successor, in a sense, of all that went before, a step only in the march of improvement, and limited, therefore, to its precise form and elements, as the patent in suit is conceded to be. In its narrow and humble form it may not excite our wonder, as may the broader or pretentious form; but it has as firm a right to protection. Nor does it detract from its merit that it is the result of experiment, and not the instant and perfect product of inventive power."

In New York Scaffolding Co. v. Whitney, 224 F. 452, 457, this court, through Judge Sanborn, speaking of patentable novelty, has this to say:

"Did the combinations of Henderson have the attribute of patentable novelty? They disclose simple and useful improvements. Their simplicity, however, is no bar to their patentability. 'The fact that the invention seems simple after it is made,'

says the Supreme Court, 'does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that, if those skilled in the mechanical arts are working in a given field, and have failed after repeated efforts to discover a certain new and useful improvement, that he who makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor' "—(citing Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 53 L. Ed. 1034, and Diamond Rubber Co. v. Consolidated Tire Co., supra).

Also: "The remarks of the Supreme Court in Diamond Rubber Co. v. Consolidated Tire Co., 220 U. S. 440, 31 S. Ct. 444, 55 L. Ed. 527, are not inapplicable here. 'It is conceded,' said that court, 'as we have said, that his invention is a narrow one—a step beyond the prior art—built upon it, it may be, and only an improvement upon it. Its legal evasion may be the easier (Railway Company v. Sayles, 97 U. S. 554 [24 L. Ed. 1053]), and hence we see the strength of the concession to its advance beyond the prior art, and of its novelty and utility by the Rubber Company's imitation of it.' "

Perhaps the latest case in the Supreme Court of the United States, involving a simple change in the prior art, is Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523. In that case the Supreme Court held it invention to increase the pitch of a paper machine so as to speed up operation. This appeared to be but an application of the law of gravity, to make the fluid stock run more rapidly. Mr. Chief Justice Taft, delivering the opinion of the court, said:

"In administering the patent law the court first looks into the art to find what the real merit of the alleged discovery or invention is and whether it has advanced the art substantially. It it has done so, then the court is liberal in its construction of the patent to secure to the inventor the reward he deserves. If what he has done works only a slight step forward and that which he says is a discovery is on the border line between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope and infringement will be found only in approximate copies of the new device. It is this differing attitude of the courts toward genuine discoveries and slight improvements that reconciles the sometimes apparently conflicting instances of construing specifications and the finding of equivalents in alleged infringements. In the case before us, for the reasons we have already reviewed, we think that Eibel made a very useful discovery which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious and entitled to liberal treatment. Indeed, when one notes the crude working of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers; and certainly finds no reason to withhold from the really meritorious improver, the application of the rule, 'ut res magis valeat quam pereat,' which has been sustained in so many cases in this court."

In referring to the Eibel Case, in Trane Co. v. Nash Engineering Co., 25 F.(2d) 267, 269, the Circuit Court of Appeals of the First Circuit says:

"The Eibel Case certainly admonishes this court to give great weight to the practical results from a claimed invention; to look beyond the paper expression to the state of the art, before and after an alleged invention which is tested in actual practice. Dubilier Condenser Corp. v. N. Y. Coil Co. (C. C. A.) 20 F.(2d) 723, 725; Minerals Separation v. Hyde, 242 U. S. 261, 270, 37 S. Ct. 82, 61 L. Ed. 286. An invention is a real thing; a patent is the description of it in words and/or drawings. McClain v. Ortmayer, 141 U. S. 419, 12 S. Ct. 76, 35 L. Ed. 800. The description must be reasonably adequate, in order to warn the public and competitors of the nature and extent of the monopoly claimed. But the essence of the matter is a new and useful reality, frequently best tested and demonstrated by actual experience."

See, also, Brown Bag-Filling Mach. Co. v. Drohen (C. C.) 140 F. 97; The Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; Hall Signal Co. v. General Ry. Signal Co. (C. C.) 168 F. 62; Force v. Sawyer-Boss Mfg. Co. (C. C.) 111 F. 902; Schenck v. Singer Mfg. Co. (C. C. A.) 77 F. 841; Loom Co. v. Higgins, 105 U. S. 580, 26 L. Ed. 1177.

Ear tags were old. The desirability of a tag such as Hennefer produced must have been apparent for many years, and yet

he was the first to make it. The same argument which is made to defeat the patentability of his device could be made with like force against the prior art patents cited by the defendant. The ear tag of Baker provided a simple and somewhat obvious way to secure the result which he desired. Callison's ear tag was simple, as was the Davis poultry band, and the Possner paper clip. The question as to whether this improvement of Hennefer rose to the dignity of invention is a doubtful one, but the burden was upon the defendant to show that it did not. There was evidence to justify a conclusion that it was a substantial contribution to the art, that it solved a problem which had been under consideration for some time, in an effective and economical way, and that there had been a real demand and need for it. We have reached the conclusion that the trial judge, upon the evidence before him, was justified in holding the patent in suit to be valid.

The decree is affirmed.