## HUGHES TOOL CO. v. INTERNATIONAL SUPPLY CO.*
### No. 129.

Circuit Court of Appeals, Tenth Circuit.
Jan. 17, 1931.

*Rehearing denied March 21, 1931.

McDERMOTT, Circuit Judge, dissenting in part.

George I. Haight, of Chicago, Ill. (Melville Church, of Washington, D. C., Jno. A. Mobley, of Houston, Tex., C. B. Ames and B. A. Ames, both of Oklahoma City, Okl., and Jesse R. Stone, of Houston, Tex., on the brief), for appellant.

Leonard S. Lyon, of Los Angeles, Cal. (Preston C. West, of Tulsa, Okl., and Frederick S. Lyon and Henry S. Richmond, both of Los Angeles, Cal., on the brief), for appellee.

Before LEWIS, COTTERAL, and McDERMOTT, Circuit Judges.

COTTERAL, Circuit Judge.

In this suit, brought by the Hughes Tool Company against the International Supply Company, complaint was made of the infringement of three patents. Those here involved are No. 1,320,384, issued to Godbold and Fletcher, November 4, 1919; and the other No. 1,480,014, issued to F. L. Scott, January 8, 1924. Claims 3 and 4 of the former and claims 1 to 4, inclusive, of the latter were alleged to be infringed. The defenses were invalidity of the patents and noninfringement. The District Court held the former patent invalid as to both claims, and the latter not infringed as to any of the claims. The result was a dismissal of the bill; and the plaintiff appeals.

The Godbold and Fletcher patent was designed as an improvement on the Hughes patent of December 27, 1910, relative to cutters for rotary drills used in boring oil wells. It is assailed as not disclosing invention, and as anticipated by a prior patent issued to Hughes and by publication in catalogues of plaintiff's predecessor.

The Hughes patent provided for a pair of rotating cutters, of cone design, which

were attached to heads of drill pipes, and cut rock and earth in the process of drilling. Each head had a threaded integral spindle on which a bushing was screwed and rested in the hollow of the cutter, and was held in that position by a ring screwed into the cutter but rotating with it about the bushing over the spindle. These parts were attached and detached separately. In mounting the cutter, the bushing was screwed upon the spindle by a bar extending through a lateral hole in the ring into a depression on the bushing, and the cutter was then screwed on the ring, which was held stationary by a bar inserted through a hole in the back of the bit head, penetrating a vertical hole in the ring. To remove the parts, the bar was inserted through the hole in the bit head into the vertical hole in the ring to hold it stable, while the cutter was unscrewed from it, the bushing and ring were removed by inserting a bar through a lateral hole in the ring, reaching the depression in the bushing and thereby unscrewing it. The actual construction of these parts was varied later by drilling two holes at the base of the cutter, through which set screws were inserted into flats or depressions in the ring, thus more firmly attaching the cutter to the ring.

In the Godbold and Fletcher patent, claims 3 and 4 are as follows:

"(3) a cutter shaft, a bushing, threaded thereon a cutter, enclosing the end of said bushing and shaft, a locking ring to secure the cutter rotatably on the said bushing and means to screw or unscrew said bushing into or from said shaft, while said cutter is mounted thereon."

And:

"(4) a cutter shaft, a bushing, a cutter fitted over and enclosing one end of the bushing, means to lock cutter rotatably on said bushing and means to attach or detach said bushing on said shaft while the cutter is locked thereon."

The objects of the patent are stated to be "(1) to provide a bearing and locking means for the rotatable cutters on a roller boring drill, which will be simple in structure and easily detachable;" and "(2) to so construct the bushing on a drill cutter that cutter and bushing may be assembled at the shop and readily attached to the cutter shaft in the field without being taken apart, thereby preserving the bearings clean at all times."

The parts of this patent are the same as in the Hughes patent, except that the two holes at the base of the cutter are perfectly aligned with holes in the ring so that a bar or wrench may be inserted through those holes into a depression in the bushing, the bushing screwed on or off the spindle, and the parts attached or removed as a unit. The hole in the bit head is eliminated.

The case being tried and submitted, the District Court by a decree held the patent in suit invalid and dismissed the bill. There was no formal finding of the facts. In an opinion,[1] the District Judge expressed his views from the testimony, as follows:

"Now, a great deal of testimony has been introduced by both the plaintiff and defendant as to whether this old Hughes device was capable of being assembled as a unit and sent out for use in that way, or whether or not it should be assembled in its different parts after it reached the floor of the derrick where the well was being drilled. I am pretty much impressed that the testimony shows in its practical use it was assembled part by part for at least a great many years after its invention, but I am further convinced from the testimony that the only thing that was necessary to assemble it in the factory, and send it out as a unit, was the additional use of a little mechanical skill; and that that was all that was necessary."

It appears that Mr. Fletcher, one of the patentees, after testifying in detail as to the advantages of the patent, was unable to state what original idea he had in the invention. In view of his previous testimony, it seems clear that the latter answer must have been confined to his part in the invention and not to that of both inventors. This explanation being made by plaintiff's counsel, in the colloquy which followed, the court said:

"Anyway, he did not explain to me, Mr. Church. He was on the stand and failed to point out to me any contribution that he and Mr. Godbold made to any use that the old Hughes Tool Company bit could not be put to.

"If the inventor could not do that, it would be asking too much of the court to decide, based upon a large volume of testimony, of which the major portion involved the testimony of the two skilled engineers explaining the use of them, to go further and say he could find any contribution that they had made to the prior art.

"I am fully convinced that this old invention was a very useful art and made a valuable contribution to the oil industry in the way of a useful device. Of course, it just occurs to me that the patent of Godbold and Fletch-

---

[1] Journal entry. No written opinion filed.

er, under the present testimony that has been introduced, cannot be sustained as a valid patent."

The facts were as the trial judge regarded them that the Hughes cutters were sent out and assembled part by part and doubtless that the unit construction originated with the patent in suit. We concur, not only because there was no obvious mistake in arriving at these facts· [New York Life Insurance Co. v. Griffith (C. C. A.) 35 F.(2d) 945], but because they were amply proved. But within our province of reviewing the evidence in an equity case, we find the estimate of Mr. Fletcher's testimony was due clearly to a mistake, as he explicitly described the practical and valuable improvement wrought by the unit cutters. And it was error to hold that only mechanical skill was requisite to the unit construction of the cutters, as is demonstrated by a brief reference to the established facts.

The plan of unit assembly was new in the art and had undoubted utility. The life of a cutter is not more than a day and it must be often·replaced. The parts require accurate fitting. The cutters are "heat treated" and must be fitted on the bushing, and this is preferably done at the shop to avoid mismating them at the derrick. Cuttings cling to the exposed parts and produce difficulty when separately attached and removed, particularly in unscrewing the cutter from the ring by means of the bar through the hole in the bit head, as it required the use of a sledge hammer, and the bar was apt to bend or shear and necessitate resort to the shop for aid and repair. The unit construction of the parts saved to drillers much valuable time and consequent financial loss. For years the need of the improvement was a problem for study in appellant's factory, and skilled mechanics long failed to reach a solution; but it was finally solved by Godbold and Fletcher. The new cutters have been well patronized and they substantially increased the·sales of plaintiff.

It is true the patented improvement was simple in character, but the simplicity of a device does not show the invalidity of a patent, and its popularity has an influential bearing on its novelty and usefulness. Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527; Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Jensen-Salsbery Laboratories v. Salt Lake Stamp Co. (C. C. A.) 28 F.(2d) 99. And where an existing patent·is deficient and the prolonged efforts of experts

have failed to remedy it, the discovery of the needed improvement, added to its commercial success and the presumption of validity, justifies the conclusion that it is due to invention and not mechanical skill. Pelton Wheel Co. v. Doble (C. C. A.) 190 F. 760; Wirebounds Patents Co. v. Saranac Automatic Machine Corp. (C. C. A.) 37 F.(2d) 830; Frick Co. v. Lindsay (C. C. A.) 27 F. (2d) 59. We are convinced that patentable invention is disclosed by the patent in suit.

This view is not opposed to the opinion of this court in Linville v. Milberger, 34 F. (2d) 386. Principles based on the authorities, and there approved and applied, are that what would be obvious to a mechar· acquainted with a business or required onl. the ingenuity or skill of a mechanic is not invention, that if all the elements in one patent are found in different patents it is relevant to consider them as a test of invention, that a mere carrying forward or more extended application of the original idea involving·a change only in form, proportions, or degree where the same work is done in the same way and by substantially the same means, although with better results, is not such invention as will sustain a patent. Nor is the formula applicable as expressed in Magic City Kennel Club v. Smith, 38 F.(2d) 170, 173, also decided by this court, that "an idea that would naturally occur to a skilled mechanic acquainted with the business, in the ordinary processes of manufacture or construction, is not patentable." In this case, skilled mechanics labored in vain without solving the problem, and finally the patentees by the alignment of the holes in the cutter·parts originated a new method of assembly, which is performed in a different way and by other means than was theretofore employed, and was not the result of mere ingenuity or skill, but worked such a novel and advantageous improvement in fact as to constitute a patentable invention.

In order to show anticipation ·by the first Hughes patent and the catalogues, a model was constructed under the direction of defendant's expert witness, Mr. Doble, and put in evidence. It was claimed the model conformed to the Hughes patent and showed the unit assembly of the parts, in an alignment of the holes in the cutter and ring. The model was constructed from certain blueprints which Mr. Doble·testified Mr. Hughes furnished to the Union Tool Company at Torrance, Cal., in 1919 or 1920, from which to recut the cones. The parts were reproduced in the model, but it differed essentially from the Hughes cutters. In them, there were no

holes in the ring opposite to the screw holes in the cutters, and the screw holes were aligned only with flats on the ring, but the model showed the cutter and ring holes in alignment and no flats on the ring, although the blueprint of the ring shows the legend at the margin, "Grind flat for 2 set screws." The catalogues were issued in 1912 and 1913. One of them advised care in placing the hole in the cutter "opposite hole in retaining collar (ring), so set screw will enter it freely and its head go at least ⅒ inch below surface." (Dft. Ex. 5, p. 94.) But the reference to the hole in the ring meant a counter-sunk recess or depression for receiving the set screw. The depth of penetration as stated and the illustrations with their explanation (page 96) satisfactorily clear up uncertainty as to the fact. Another catalogue was corrective, in directing the set screw hole to be placed opposite the flat on the ring, and the illustrations (page 32) show a set screw hole opposite a flat. (Plff. Ex. 16, p. 30.) This is confirmed by the illustrations in the other catalogues. (Dft. Ex. 1, p. 42; Dft. Ex. 4, p. 76.) It seems unreasonable to believe that the plaintiff in selling the Hughes cutters once aligned the holes in the cutter and ring, but later abandoned the practice. Besides, the undisputed testimony referred to is that for years plaintiff sought to discover the unit method of alignment. The model portrays the patent in suit and not the Hughes patent. The evidence failed to show anticipation by the prior patent or the catalogues.

There is testimony of witnesses who used the Hughes patent in the field. The trial court found the Hughes cutters were sent out and assembled part by part. We have compared the testimony and find it insufficient to establish that the Hughes cutters were practicably capable of the alignment required for the unit construction of the patent in suit. But if we assume it to have been possible, it would have been attended with such difficulty as to be far less advantageous than the use of the hole in the bit head, and would not detract materially from the value of the improvement effected by the patent in suit.

The later Hughes patent cited as anticipating this patent is No. 1,174,577, issued on March 7, 1916. The expressed object of that patent was "to provide a cutter-retaining means of novel design which can be manufactured cheaply, which enables the cutter to be applied and removed quickly, and overcomes the necessity of forming a hole in the head to receive a tool for holding the retaining ring at rest when the cutter is being attached to and disconnected from same." The parts of the cutter are practically the same as in the original Hughes patent, except as to the ring, which, instead of being threaded and screwed into the cutter, is loose and has a groove in its outer surface into which five set screws are inserted through as many holes in the cutter, and thus the cutter and ring are held together. By removing these screws the cutter is released, and the use of the hole in the bit head is eliminated. But there is no alignment of the holes in the cutter with holes in the ring. There was no anticipation by this patent.

The trial court did not reach the question of infringement, but we must of course consider it. The cutters sold by the defendant are found to disclose the same method of attachment and detachment as a unit, by the use of a tool inserted through the cutter into the recess in the bushing. This is apparent from considering claims 3 and 4 of the patent in suit. The only real difference is that the ring is absent and in its place are matched grooves in the bushing and cutter in which a series of balls is placed, preventing the removal of the cutter while it rotates on the bushing. Claim 4 of plaintiff's patent specially describes a cutter shaft and bushing, a cutter inclosing one end of the bushing, means to lock the cutter rotatably thereon, and means to attach or detach the bushing, when the cutter is locked upon it. It is an equivalent to dispense with the ring and attain the same result. Where the substance of a patent is copied, precise form which is nonessential to function or process is immaterial. Sanitary Refrigerator Co. v. Winters, 280 U. S. 30, 50 S. Ct. 9, 74 L. Ed. 147; Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935; Linville v. Milberger (C. C. A.) 34 F.(2d) 386. The defendant by its cutters employs the conception of plaintiff's patent, and there is nothing to differentiate it. We therefore hold that by adopting the equivalent of plaintiff's patent, infringement resulted.

Our conclusion is that the Godbold and Fletcher patent should be sustained. In our view, as indicated, the decree of the District Court is clearly erroneous in denying its validity, and in not determining the issue of infringement adversely to the defendant.

With regard to the Scott patent, we confine our decision to the issue of infringement arising from the sale of cutters by the defendant. The four claims of the patent are comprised in claim 2, which is as follows:

"2. In a roller earth-boring drill, the combination of a head, two opposite approxi-

494

mately frusto-conical shaped cutting rollers mounted on the forward end thereof and circumferential rows of teeth on each cutter, those on one being formed at different distances from the end thereof than are those on the other cutter so that they may interfit without contact with each other, and be thus adapted to clear each other of material tending to adhere thereto during use."

The object sought was that the cutters were "to be so shaped and mounted as to cooperate to clear each other of material which would otherwise tend to adhere thereto and thus clog the cutting action of the drill." This is said to be accomplished by the interfitting teeth of the cutters but without contact. It was conceded that the construction of the cutters and the assembly of the parts are quite similar to those in the Godbold and Fletcher patent.

The defense with respect to infringement was that the defendant's cutters showed a different mode of operation and inter-relation of the parts, in that the teeth of the cutters did not interfit and left a clearance space for the passage of mud fluid. A decisive issue of fact was therefore involved at the trial. The decree was general that there was no infringement. But it was necessarily based on a finding for the defendant upon the disputed fact as to the relation of the cutters and the mode of operating them. That finding is sustained, because, according to the rule heretofore stated, it does not satisfactorily appear it was due to an obvious mistake in the consideration of the evidence. The finding has persuasive corroboration in the claim of the defendant that the intentional separation of its cutters allowed a preferable method of clearing away the detritus by the process of flushing.

The plaintiff's patent is limited to the claims set forth, and in order to establish infringement they must be broadened beyond their fair scope so as to include the cutters sold by the defendant, but this is not permissible. It is unnecessary to consider, in defendant's favor, the further fact that plaintiff's patent was narrowed materially by a disclaimer filed in the patent office. We conclude that the defendant did not infringe this patent.

The decree relative to the Godbold and Fletcher patent is reversed, with direction to enter a decree for the plaintiff of infringement of claims 3 and 4, and if the plaintiff so elects, direct an accounting. The decree relative to the Scott patent is affirmed.

McDERMOTT, Circuit Judge (dissenting in part).

I cannot agree with the conclusions reached by my associates as to the Godbold and Fletcher patent. I agree with the principles of law stated by Judge COTTERAL, but I cannot agree as to the facts. I also agree with Judge COTTERAL that an isolated answer of the inventor while on the witness stand, which was emphasized by the trial court in a colloquial way, is not entitled to emphasis. However, I put little emphasis on the colloquy itself, as I do not understand that a trial court's remarks impair the force of the general findings of its decree. But the record is here, and without reference to the weight to be given the findings of a Chancellor, I think the patent has been anticipated, involves no inventive genius, and has not been infringed.

I agree that a patent should not be held invalid unless the proof of anticipation is clear and convincing. There was some oral evidence of unit disassembly prior to the patent in suit, but standing alone, I do not think it measures up to the standard. But it has some weight when considered with the record evidence to which I now refer.

There are many undisputed facts, and one in particular in dispute. The undisputed facts are that for many years prior to the patent in suit, the cutter-cone had been screwed onto the retaining ring, and had been held in place by a set-screw. The cutter and the ring rotated freely about the bushing. The bushing had always been dismounted by inserting a bar through a hole in the ring into a hole in the bushing. The holes in the ring and bushing had always existed for the particular purpose of assembly and disassembly. They had always been aligned vertically, else the bar could not have penetrated both. They never were circumferentially aligned, and are not now, for the ring rotates about the bushing. The 1910 patent to Hughes, the blue-prints, all the catalogues, the photographs, and every witness for both parties disclose this. Furthermore, the mechanics of the device demand it. We start then with holes in the ring and the bushing, aligned to receive a bar or other tool for assembly and disassembly.

It is likewise undisputed that for many years prior to the patent in suit there has been a hole in the face of the cutter, which was used for the set-screw. The plaintiff's witnesses, the catalogues, the photographs and the blue-prints disclose this hole. Again

the mechanics demand it, for a set-screw could not function without a hole in the cutter.

We have then, without dispute, aligned holes in the ring and bushing; and a hole in the cutter. The briefs of the plaintiff assure us that "the essence of this invention consists in providing purposely and permanently aligned holes in retaining ring and cutter." If the record evidence discloses such alignment prior to the patent in suit, there is an anticipation, for I am sure my associates would agree that if such alignment is disclosed, plaintiff cannot patent an additional function thereof, such as using the aligned holes for a crow-bar instead of a set-screw.

Does the record disclose that the holes in the cutter and the ring had ever been aligned? A catalogue of Sharp & Hughes, a partnership predecessor of plaintiff, issued prior to 1912, carried a diagram of the assembly, showing a set-screw penetrating the ring, and the legend, "Set screw for locking retaining ring." The instructions, contained in the same catalogue, read:

"Care should be taken to get little hole in edge of Cone opposite hole in retaining collar, so Set-screw will enter it freely and its head go at least 1-16 inch below surface."

Later the catalogue was revised by the plaintiff, still long prior to the patent in suit. Most of the earlier catalogue was carried over into the revision, line for line and word for word. Where changes occur, they must have been made with deliberation and for a purpose. The diagram of the assembly was changed to show the set-screw bearing against, but not appreciably penetrating, the ring. Moreover the legend was changed, and for the first time a "flat" on the retaining ring appears. The later legend reads, "Screw set screw against flat on retaining ring using special wrench furnished with each bit." Note the difference in the legends. But even more striking is the change in the printed instructions. The later catalogue drops all reference to "hole in retaining collar" and to the depth of penetration. Instead, it reads:

"Care should be taken to get little hole in edge of Cone opposite flat place on retaining ring, so Set-screw will hold."

To me, these catalogues incontrovertibly show that originally the set-screw had entered the hole in the retaining ring, just as the earlier catalogue says and shows; that later, they changed the construction so the set-screw would bear against a flat space, just as the later catalogue says and shows.

This was probably done to remove the danger of the set-screw working against the bushing, or the expense of constructing a stop on the set-screw. But whatever the reason, I cannot charge these clear and deliberate changes in the catalogues to mere inadvertence; nor can I say that when they said "hole" they meant "counter-sunk recess or depression," as the majority opinion says, for those words describe a "flat" and not a "hole."

It goes without saying that if the set-screw was originally designed to fit into the "hole in retaining collar," as the catalogue says, the two holes must have been aligned. The only question is whether it ever did fit into the hole. The catalogue, carefully prepared, says it did; it was changed so that the set-screw should no longer enter that hole, but should bear against a flat place. I do not think the change "corrective"; I think it was deliberate, and indicates a change in construction to any mechanic. We must either say that the later catalogue disclosed the same construction as the earlier one, or there has been an anticipation. I think there was an anticipation.

Nor do I think there was invention. The plaintiff's only claim to invention is the vertical and circumferential alignment of two holes; already there was vertical alignment of the holes in the ring and bushing; on plaintiff's theory, there had always been both vertical and circumferential alignment between the hole in the cutter and the flat on the ring. So all plaintiff can claim is that he pushed an existing alignment of two holes to include a third; or substituted an existing vertical and circumferential alignment with a "flat" to an exactly similar alignment with an existing hole. I cannot see where that involves genius within the definition of this court that "That which would be obvious to a mechanic, acquainted with the art, is not patentable. Gates Iron Works v. Overland Gold Min. Co. (C. C. A. 8) 147 F. 700, 702, 703." Linville v. Milberger (C. C. A.) 34 F.(2d) 386, 388. This court held in that case that putting on a third lever, where two already existed, was not patentable. But all that was done here, on plaintiff's own claim, was to align a third hole with two already aligned. Personally, I cannot see where it involves even mechanical skill. If alignment of a third hole involves inventive genius, I cannot see why the plaintiff may not, when the present patent has expired, insert a shim or washer between the bushing and ring, put a hole therein, align this fourth hole with the three

already aligned, patent the additional alignment, and extend its monopoly ad infinitum. Counsel ask, Why was it not done before? Many answers suggest themselves, one of which is that a prudent manufacturer, protected by a patent as was true here, would prefer to let the operator assemble rather than assume all the risk of unsatisfactory results from a device already assembled. When the old patent expired, this device was resorted to in order to extend the term of the patent. Business success is little argument where, by virtue of a patent monopoly, the plaintiff controlled the field for seventeen years.

Nor do I think there was infringement. Plaintiff claims that his invention was in the alignment of holes in the cutter and ring. But defendant uses no ring; there is no hole in the non-existent ring, and hence no alignment. To say there is infringement is to give the plaintiff a monopoly for seventeen years on any arrangement for a unit assembly of a rotary drill, an important factor in the drilling of oil wells, and one where plaintiff has already enjoyed a monopoly for the statutory period.

For these reasons I think the decree of the lower court should be affirmed in its entirety.