**STEARNS–ROGER MFG. CO. v. RUTH.**
No. 647.

Circuit Court of Appeals, Tenth Circuit.

Dec. 19, 1932.

*Rehearing denied January 24, 1933.

Henry D. Williams and G. Willard Rich, both of New York City (Carlos G. Stratton, of Denver, Colo., and Giles S. Rich, of New York City, on the briefs), for appellant.

Max D. Melville, of Denver, Colo., for appellee.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

Ruth brought this suit against the Stearns-Roger Manufacturing Company for alleged infringement of patent No. 1,277,750 issued on September 3, 1918, for a flotation process and apparatus. From a decree adjudging claims one and three of the patent in suit valid and infringed, the Stearns-Roger Company has appealed.

The patent in suit relates to a process and machine for separating metalliferous minerals from rock by flotation. In general the process is as follows: The ore is so finely ground that the metalliferous mineral and the rock or gangue, with which it was associated in the ore, are reduced to distinct particles. The ground ore is mixed with sufficient water to produce a pulp which will flow freely. A mineral frothing agent is added. Air is forced through the pulp forming diffused air bubbles. These air bubbles select and attach to themselves metalliferous particles, and reject gangue particles, and because of their buoyancy carry the metalliferous particles upward through the pulp and form into a metal bearing froth floating upon the surface of the pulp. This metal bearing froth, called concentrate, floats or is skimmed from such surface and the remainder of the pulp, called tailings, passes into the next unit.

The machines employed are built in sev-

eral units, each of which repeats the process so as to ultimately effect substantially a complete separation.

Figure 1 of the patent drawings is as follows:

Claim 1 may be analytically stated as follows: The herein described flotation process including (a) aerating the pulp, (b) overflowing the froth, (c) maintaining the tailings in suspension by an upward circulation of the pulp in a flotation compartment, and (d) overflowing the tailings wholly from said compartment at a substantial distance above the inlet and in proximity to the level of the overflow of the froth but separate therefrom.

Claim three may be analytically stated as follows: A flotation separating unit comprising (a) an agitation compartment and (b) a flotation compartment having a froth overflow, (c) the said compartments communicating at the bottom, (1) the flotation compartment being relatively deep and (2) having a tailings discharge away from the unit, at a substantial distance above the inlet and in proximity to the level of the froth overflow, but separate therefrom, (3) the unit being otherwise closed against the discharge of the tailings.

In the carrying out of the process, it is essential that a proper pulp level be maintained. If the pulp level rises too high, a part of the pulp will escape with the froth and ruin the concentrate. If it falls too low, the froth will collapse back into the pulp and will be carried out with the tailings.

The impeller 18 in the patent in suit impels the pulp by centrifugal force upward through the flotation compartment 10 and, notwithstanding a variation in the flow of pulp, maintains a pulp level in the flotation compartment almost as high as the top of the sides adjacent to the flotation compartment, of launders 26 and 27, over which sides and

into which launders the froth overflows, and forces the tailings to overflow into the next unit through trough 24, which acts as an overflow weir, slightly below the level at which the froth overflows. Thus the proper pulp level is maintained automatically without adjustable valves to regulate the overflow of tailings.

This impeller also draws the pulp from the receiving compartment practically as rapidly as it enters, and with it air through opening 22 and mixes the air and pulp. Aeration of the pulp is also in part effected by the fact that the pulp enters the first unit and each succeeding unit at the top and is cascaded to the bottom of the receiving compartment, which is kept comparatively free from pulp by the force of the impeller.

The impeller also forces the heavier as well as the lighter particles to the top of the flotation compartment before they escape into the next unit, and thus gives more opportunity for the bubbles to attach to and carry off the heavier particles.

Where the pulp is forced through a separation unit by hydrostatic pressure, proper pulp level cannot be obtained automatically, and regulating valves are required. While an overflow weir would keep the pulp level from rising too high, it would not keep it from falling too low should the inflow of pulp fall substantially below the outflow of tailings.

Where the pulp is forced through the flotation compartment by an impeller, a proper pulp level cannot be automatically obtained, and regulating valves are necessary if the tailings are permitted to escape at a point substantially below the level where the froth overflows.

Pearce obtained automatic pulp level control by combining an impeller and a tailings discharge in proximity to and only slightly below the level of the froth overflow.

## I. Anticipation.

A large number of patents of the prior art were alleged and proven for the purpose of showing anticipation of claims one and three of the patent in suit. These prior patents may be divided into three types.

Type 1. Where the pulp enters the unit at a point above or approximately at the same level with the point of exit of the tailings, where all tailings are overflowed, and where the undulating travel of the pulp through the unit is primarily due to the hydrostatic head created by the difference in level between inlet and discharge, and where the progress of the larger particles of the pulp through the unit is animated by overflow weirs.

In this type are the following devices:

Inspiration Machine, Callow No. 1,366,-766, Gahl No. 1,346,817, Gahl No. 1,346,818, Groch No. 1,276,753, and Rouse No. 469,599.

It will be seen at once that a device operating by hydrostatic pressure cannot have a tailings discharge away from the unit at a substantial distance above the inlet.

Figure 1 of the Groch patent follows:

Counsel for the Stearns-Roger Company contend that, in considering Groch's device, the several groups of compartments separated by weirs G and partition $e^2$ should be regarded as constituting distinct flotation separation units. They may be so regarded in the sense that each carries out the process of flotation separation, but not in the sense that each operates independently, because, as we shall undertake to show, they cannot successfully carry out such process without the co-action of other essential elements in the device.

In Groch's device the pulp enters the device at the top through opening b and leaves it at the bottom through opening e. Opening e has a regulating gate or valve $e^1$. The pulp enters the first agitation and flotation compartment through inlet $c^1$, and the succeeding ones through inlet $c^2$. The agitators M aerate the pulp but do not force it up over weirs G by centrifugal force. If the agitators applied sufficient force to the pulp to lift it over the weirs, they would impel it backwards through inlets $c^1$ and $c^2$. The inlet into each succeeding agitation and flotation compartment at $c^2$ is substantially below the inlet of the preceding one, and outlet $e^3$ from the last flotation compartment to the right is on a level with $c^1$, and the outlet c is below all of the inlets $c^1$ and $c^2$. From the foregoing it will be seen that the pulp is impelled through the device by hydrostatic pressure and not by centrifugal force of the agitators. Since Groch employs hydrostatic pressure instead of centrifugal force to move the pulp through the device, if the inflow of pulp falls substantially below the outflow of tailings, the pulp level will fall too low. In Groch the only means for retarding the outflow of tailings is regulating valve or gate $e^1$. Since all of the several compartments in the device communicate with each other by openings through which the pulp passes, the closing of gate e and the consequent raising of the pulp level in chamber E, to the extreme right of the device, would tend to raise the pulp level throughout the entire device. Thus it will be seen that regulating valve or gate $e^1$ co-acts as an element in each of such several groups of compartments in the device, considered as distinct units. The closing of outlet e may not be a practical way to keep the pulp level from falling too low, but it is the only method disclosed by Groch.

It follows that Groch employs a regulating valve instead of an impeller to keep the pulp level from falling too low, and does not disclose the principle by which Pearce automatically attains proper pulp level.

Type 2. Where the pulp enters the unit at approximately the pulp level therein, and where only the lighter tailings are overflowed, the remainder discharging at or near the bottom, there being no means provided to impel and compel them to overflow with the lighter material.

Included in this type are the following patents: Haley No. 1,357,556, Haley Australian Patent No. 1117/16, Janney No. 1,342,115, Shimmin & Bushnell No. 1,402,099, Smith No. 1,056,952, Callow No. 1,201,934, Hoover No. 979,857, Anaconda Machine, Engel's Machine, Hebbard Machine, and Ohio Copper Company Machine.

A fair example of this class is the Haley patent, No. 1,357,556. Figures 4 and 6 of this patent are as follows:

Fig. 4.

Fig. 6.

In the Haley machine the pulp is fed into the centrifugal pump 5 and is forced by means of the pump out through the restricted nozzle 9 and projected into the aerating well 10. From this well the pulp overflows into the flotation compartment 11. The lighter tailings escape between baffle 23 and an adjustable gate 25, and pass out through the overflow box 26 and pipe outlet 27, while the heavier tailings pass through outlet 20. The

valve in 20 and the adjustable gate 25 regulate the height of the pulp. In the Haley device the pulp, after leaving the aerating well, travels by gravity. In the patent in suit the pulp is moved by the centrifugal force of the impeller. Because of this difference, in the patent in suit all of the tailings can be discharged over the weir, while in the Haley patent a discharge opening and a regulating valve in the bottom of the flotation compartment are essential.

The Anaconda machine, which is an improved device constructed under the Hoover patent, employs a circular weir overflow, and also a valve outlet from the separation compartment to maintain the proper pulp level. If the flow of pulp into the machine varies, adjustment of the valve is necessary to maintain a proper pulp level.

Type 3. Where the air is introduced at the bottom of the unit, where means is provided to maintain the tailings in suspension by an upward circulation of the pulp, and where the tailings could have been overflowed and automatic valveless regulation could have been obtained but was not, and valve control is utilized.

In this type are included the following patents: Callow No. 1,141,377, Callow No. 1,104,755, Fagergren & Green No. 1,195,453, Owen No. 1,155,836, Higgins No. 1,155,816, and Brittain No. 1,224,066.

Figure 2 of the Callow patent, 1,141,377, is as follows:

To this figure we have added arrows to indicate valves O and have indicated the inlet to the unit by X, and the tailings discharge by Y. From the specification and drawing, it is clear that the pulp is forced from one unit to the other by hydrostatic pressure and the height of the pulp is regulated by the valves O.

The following is figure 3 of the Brittain patent.

This is the nearest approach to the patent in suit found in the prior art. The froth passes out over the eve-board 15, the tailings pass out through opening 5, a substantial distance below the level at which the froth overflows. In order to maintain the proper pulp level, valves or gates are provided by which openings 5 and openings 23 may be enlarged or reduced. Brittain did not discover the principle of automatically maintaining the proper pulp level by overflowing the tailings at substantially the same level as the level at which the froth overflows.

A new combination of old elements whereby a new and useful result is obtained or whereby an old result is obtained in a more facile, economical, and efficient way is patentable, provided the discovery and reduction to practice of the novel combination requires greater skill and higher thought than would be expected of an ordinary mechanic trained in the art. Minneapolis, St. P. & S. S. M. Co. v. Barnett & Rec. Co. (C. C. A. 8) 257 F. 302, 306; Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co. (C. C. A. 8) 215 F. 362, 369; National Hollow B. B. Co. v. Interchangeable B. B. Co. (C. C. A. 8) 106 F. 693, 707; Galvin Elec. Mfg. Co. v. Emer-

son Elec. Mfg. Co. (C. C. A. 8) 19 F.(2d) 885, 890.

■ The fact that others in quest of improvements approached close to but did not discover the principle and mode of operation by which automatic pulp level control is accomplished in the patent in suit, and that such control constitutes a much desired and substantial improvement in mineral separation devices, indicates that such principle and mode of operation would not have been apparent to an ordinary mechanic skilled in the art, who was seeking to accomplish such control. New York Scaffolding Co. v. Whitney (C. C. A. 8) 224 F. 452, 457; Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 53 L. Ed. 1034.

■ We are of the opinion that Pearce has simplified and increased the efficiency of the process and apparatus for flotation separation, and has made a valuable contribution to the art; that, while the elements of claims one and three are old, the combination thereof is new and an old result is produced in a more facile, economical, and efficient way; and that the discovery and reduction to practice of such novel combinations rose above the skill of the ordinary mechanic trained in the art.

We conclude, therefore, that claims one and three are valid.

## II. Infringement.

The alleged infringing device is illustrated by the following drawings:

**PLAN OF LATTICE-GRID BAFFLE**

**PLAN OF VERTICAL BAFFLES**

The principal patents cited by the examiner in the prosecution of Pearce's application were the Brittain, and Haley No. 1,357,556. Brittain was overcome by a showing that the discharge of the tailings at a point near the level of the froth overflow, together with the action of the impeller which forces the pulp to and maintains it at that level, regardless of the amount of pulp being fed into the machine, avoids the necessity for valve regulation employed by Brittain. Haley was overcome by the showing that in claims one and three the tailings are wholly overflowed from the top of the flotation compartment and there is no discharge opening or regulating valve in the lower portion of such compartment. There are other essential differences between the Pearce process and device and that disclosed by Haley, which we have heretofore undertaken to point out. The claims were amended to make clear these differences between Brittain and Haley.

Counsel for the Stearns-Roger Company contend that in the alleged infringing device the tailings partly discharge from the flotation compartment at the bottom through opening 1 instead of at the top thereof; that the agitation and flotation compartments do not communicate at the bottom; and that the heavier tailings pass out through the sands discharge opening 2; and that, because of these differences from the process and device of the patent in suit, there is no infringement.

Except where form is of the essence of the invention, it is of little weight in determining the issue of infringement. A device which employs the principle of the patent and appropriates the substance of the invention infringes, although it differs in form or shape. Sanitary Refrigerator Co. v. Winters, 280 U. S. 30, 50 S. Ct. 9, 74 L. Ed. 147; Hughes Tool Co. v. International Supply Co. (C. C. A. 10) 47 F.(2d) 490, 493; Johns-Manville Corp. v. National Tank Seal Co. (C. C. A. 10) 49 F.(2d) 142; National Hollow B. B. Co. v. Interchangeable B. B. Co. (C. C. A. 8) 106 F. 693, 711.

The test is whether the two devices do substantially the same work in substantially the same way and accomplish the same result. Refrigerator Co. v. Winters, supra; Union Paper Bag Machine Co. v. Murphy, 97 U. S. 120, 24 L. Ed. 935; Johns-Manville Corp. v. National Tank Seal Co. (C. C. A. 10) 49 F.(2d) 142, 146.

It will be noted that in the alleged infringing device an impeller forces the pulp upward into the flotation compartment, and that by means of the force of such impeller and the weir 3 the pulp is maintained automatically at a level nearly as high as the froth overflow, and that the tailings ultimately pass over the weir at such level and from there are cascaded to the bottom of the receiving compartment of the next unit. Thus, it will be seen that the alleged infringing device employs the same principle as that disclosed by Pearce to maintain automatically the proper pulp level and to aerate the pulp. The mere fact that the infringing device has a partition 4, which forces the tailings downward before they ultimately pass over the weir, is not a difference of principle or substance, but one of form only.

It is true that in the alleged infringing device the agitation compartment and the flotation compartment do not communicate at the bottom, and in this respect the infringing device differs in form from claim three. However, the essential principle employed by Pearce is the receiving of the pulp at the bottom of the flotation compartment and the forcing of it upward through such compartment and over the weir instead of receiving it near the top of the flotation compartment at a point higher than the point of exit, and not a literal communication between the bottoms of the agitation and flotation compartments. In other words, the essential feature of the patent is the introduction of the pulp at the bottom of the flotation compartment and the alleged infringing device does this. We think such difference in the location of the two compartments is one of form and not of substance, and that the alleged infringing device employs a mechanical equivalent and appropriates the principle of the patent.

The file wrapper history discloses that Pearce amended claims one and three in order to avoid Haley, by adding the element in claim one, "overflowing the tailings wholly from such compartment at a substantial distance above the inlet"; and claim three by adding thereto, "the unit being otherwise closed against the discharge of the tailings." We are of the opinion that these amendments so narrowed the claims that the inclusion of the sands hole 2 in the alleged infringing device would avoid infringement if it were essential to the operation of the device and if it were employed in the commercial use of the device. See I. T. S. Rubber Co. v. Essex Rubber Co., 272 U. S. 429, 47 S. Ct. 136, 71 L. Ed. 335. However, the evidence established, and the trial court found, that the sands discharge was not necessary

to a proper functioning of the device, and that in the use of the commercial device this hole was kept closed.

One may not avoid infringement by making a device which differs in form or is more or less efficient than the patented device, when he appropriates the principle and mode of operation of the patented device and obtains its results by the same or equivalent means. Johns-Manville Corp. v. National Tank Seal Co., supra (C. C. A.) page 146 of 49 F.(2d); Lourie Implement Co. v. Lenhart (C. C. A. 8) 130 F. 122, 129; Smith Cannery Mach. Co. v. Seattle-Astoria Iron Works (C. C. A. 9) 261 F. 85, 88; Angelus Sanitary Can Mach. Co. v. Wilson (C. C. A. 9) 7 F.(2d) 314, 318.

The sands hole, as compared with the opening over the weir, is very small and only a slight and insignificant amount of tailings will escape through the sands hole, as compared with the amount which will pass over the weir. Therefore, even with the sands hole open, by increasing the speed of the impeller, substantially all of the tailings will be forced over the weir, the proper pulp level will be automatically maintained, and the principle of the patent in suit will be appropriated. We conclude that the sands hole effects a slight change in efficiency alone, that it is not essential to the device, and that, notwithstanding it, the alleged infringing device employs the principle and appropriates the substance of the patent.

We accordingly conclude that the Stearns-Roger Company's device and process infringes claims one and three of the patent in suit.

The decree is affirmed.