## WILLIAMS IRON WORKS CO. v. HUGHES TOOL CO.
### No. 1892.

Circuit Court of Appeals, Tenth Circuit.
Jan. 13, 1940.

---

Arthur C. Brown, of Kansas City, Mo. (Herbert K. Hyde, of Oklahoma City, Okl., on the briefs), for appellant.

George I. Haight, of Chicago, Ill. (Jesse R. Stone, of Houston, Tex., and Bohannon & Adams, of Oklahoma City, Okl., on the briefs), for appellee.

Before PHILLIPS, WILLIAMS, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

Hughes Tool Company [1] brought this suit against Williams Iron Works Company [2] for alleged infringment of five patents. From a judgment holding the patents valid and infringed, Williams Company has appealed.

Each of the patents relates to rotary bits used in well drilling. In rotary drilling a bit is mounted at the lower end of the drill stem. The bit comprises a plurality of frusto-conical shaped cutters which, when the drill stem and bit are rotated, cut and disintegrate the formation being drilled. The cuttings are continuously washed from the hole being drilled by mud which is circulated down through the drill stem and out through openings in the bit in the well hole, where the mud picks up the cuttings and returns to the surface along the outside of the drill stem. Each of the patents covers a combination of elements constituting a drill bit. Three relate to the cutting surface of the cutters and two relate to the shaft upon which the cutters are mounted and the bearings upon which the cutters travel and which hold them on the shaft.

I.

Scott Patent No. 1,480,014.

This patent was issued January 8, 1924, on an application filed January 16, 1922. It covers self-cleaning roller cutters for rotary drills. Scott first designed cutters of individual and cooperative characteristics. Theretofore the several cutters used on a rotary drill were identical, they did not cooperate with each other, and each had to be smaller than one-half the diameter of the hole to provide clearance for the teeth

---

[1] Hereinafter referred to as the Hughes Company.

[2] Hereinafter referred to as the Williams Company.

on each to pass the teeth on the others. The objects of the invention are to provide a plurality of cutters so shaped and mounted as to cooperate to clear each other of material which would otherwise tend to adhere thereto and clog the cutting action of the bit, and constructed so as to be larger and stronger than non-cooperating cutters. The embodiment of the invention illustrated in the patent drawings employs two cutters, although the patent is not limited in this respect, and the more common practice today is to employ three cutters. The device consists of a head with a threaded upper shank to screw into the drill stem. The lower end of the head is provided with a transverse V-shaped slot, on the opposite flat sides of which bearing members are mounted. On each of the bearing members is mounted a cutter which is approximately frusto-conical in shape. The two cutters when mounted upon the head have their adjacent sides lying practically within the central longitudinal axis of the drill. The teeth are positioned upon each cutter circumferentially thereof in rows along its tapered surface. The teeth upon one cutter are positioned in rows at slightly different distances from the base of the cutter than are those upon the other. The rows of teeth upon one cutter are slightly offset from the rows of teeth upon the adjacent cutter so that the rows of teeth on each cutter interfit with the rows of teeth on the other cutter. The rows of teeth are cut with grooves extending longitudinally from the base to the apex of the cutter to provide cutting edges adapted to cut and disintegrate the formation in the bottom of the hole.

The head of the drill is ordinarily rotated by means of a drill stem in a clockwise direction. The cutters roll upon the bottom of the well. The cutters revolve clockwise, but at the point between the two cutters where the teeth on one pass the teeth on the other, the teeth are traveling in opposite directions. Unless means are provided to prevent it, in drilling certain formations, material will adhere to the surface of the teeth and clog the cutting action of the cutter. In the device of the patent in suit the interfitting teeth cooperate to free and dislodge adhering material. This action keeps the cutters clear at all times and avoids, to a substantial degree, the difficulties usually experienced with roller cutters in sticky formations. The size of the bit being limited by the size of the hole, it is desirable to utilize all available space. Since the cutters cooperate and the teeth interfit, each cutter may be larger than one-half the diameter of the hole. This makes possible the use of substantially larger and stronger cutters.

Claims 1 to 4 are in suit. Claim 1 is illustrative and reads as follows:

"In the roller earth-boring drill the combination of a head, two opposite, approximately frusto-conical shaped cutting rollers mounted on the forward end thereof and circumferential rows of teeth of approximately equal size formed on each cutter, the teeth on one cutter being adapted to interfit between those of the other for the purpose described."

These claims were held valid by this court in Southwestern Tool Co. v. Hughes Tool Co., 10 Cir., 98 F.2d 42. The Williams Company does not challenge the validity of the patent, but denies infringement.

The Williams Company manufactured its first bits in June, 1935. Mr. Gruner, who designed the alleged infringing bit for the Williams Company, admitted that on some of the first bits manufactured the teeth on each cutter extended past the point of the teeth on the other cutters to the extent of approximately one-sixteenth of an inch, resulting in some interfitting of the teeth. He testified that this interfitting was accidental and unintentional and resulted from failure to make sufficient allowance for distortion of the metal in welding the cutter shaft on to the head. He stated that in some instances the distortion at the time of the welding tended to throw the shafts inwardly, causing some interfitting of the teeth. He further testified that the first bits manufactured by the Williams Company did not work efficiently and were returned and that the interfitting was eliminated by providing greater allowance for distortion in the welding operation.

The teeth on the Williams Company cutters are slightly offset relative to the teeth on the other cutters so that they may interfit, and there was interfitting of the cutter teeth in a substantial number of the earlier bits manufactured by the Williams Company. One of these bits, introduced in evidence as Hughes Company Exhibit 6, has interfitting teeth. It was found by a field representative of the Hughes Company in the Jesse Oil Field near Ada, Oklahoma, in December, 1936. This representative also observed at the same place eight other of these bits with interfitting teeth like Exhibit 6. And one Mobley saw about fifteen bits of the Williams Company, with inter-

fitting teeth like Exhibit 6, in the Ada and Seminole oil fields in Oklahoma in the fall of 1936.

The Williams Company asserts that the interfitting of the teeth in the bits manufactured by it is not sufficient in degree to effect cleaning of the teeth, and that its bits are cleaned by the flushing fluid, effected by arranging the watercourses for the flushing fluid so it passes through the longitudinal grooves between the teeth and frees any material adhering to the teeth.

It seems to us that any substantial interfitting of the teeth would tend to dislodge material adhering thereto and aid in keeping the teeth clean.

In determining whether a device infringes, we look to the modes or means of operation, the functions, and the effects of the patented device and the accused device. If they are substantially identical, the principle of the patent is appropriated and infringement results. Otherwise stated, the test is whether the two devices do the same work in substantially the same way and accomplish substantially the same result. [3]

Identity of function exists where the function is the same, although impaired in degree, and identity of result exists where the result is the same in kind, although lesser in degree. Impairment of function and lessening of result, in degree only, does not avoid infringement. [4]

Here, the modes or means of operation and the functions of the two devices are substantially identical and the result accomplished by the alleged infringing device is the same in kind and is attained in a substantial degree, although not as fully and perfectly, as by the patented device.

Counsel for the Williams Company assert that there is no evidence that Exhibit 6, or bits like it, found in the Jesse, Ada, and Seminole oil fields, were sold by the Williams Company or ever used. The bits were marked "The property of W. I. W." Exhibit 6 shows that it has been worn through use and it is a fair inference that these bits were made and sold by the Williams Company for use in drilling.

We accordingly conclude that these bits infringe the claims in suit.

## II.

### Scott and Wellensiek Patent No. 1,647,753.

This patent was issued November 1, 1927, on an application filed April 15, 1926. It relates to roller cutters for rotary drills. It is particularly directed to the size, shape, and location of the teeth on the frusto-conical shaped cutters.

The objects of the invention are self-cleaning teeth, constant rolling motion of the cutters, and effective and speedy cutting and disintegration of the formation being drilled.

Claims 2, 3, 4, and 5 are in suit. The elements of claim 4, which is typical, are:

In a rotary well drill having cutters with their cutting areas converging toward the central axis of the drill and mounted to contact with the bottom of the hole with an approximately true roller motion, the combination of

1. Cutting teeth formed on the cutters in rows extending around the conical surface thereof,

2. The teeth on one cutter being offset relative to those on the adjacent cutter,

3. The opposite sides of each row of teeth

(a) being spaced apart to allow clearance, and

---

[3] Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 442, 448;

Johns-Manville Corp. v. National Tank Seal Co., 10 Cir., 49 F.2d 142, 146, certiorari denied 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555;

Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147.

[4] Stearns-Roger Mfg. Co. v. Ruth, supra, 62 F.2d page 449;

Johns-Manville Corp. v. National Tank Seal Co., supra, 49 F.2d page 146;

Sewall v. Jones, 91 U.S. 171, 183, 23 L.Ed. 275;

Winans v. Denmead, 15 How. 330, 343, 56 U.S. 330, 14 L.Ed. 717;

Virginia Art Goods Studios v. Goldberg & Seltzer, 2 Cir., 76 F.2d 122, 123;

Telescope Cot Bed Co. v. Gold Metal C. F. Mfg. Co., 2 Cir., 229 F. 1002, 1004;

Van Kannel Revolving Door Co. v. Straus, 2 Cir., 235 F. 135, 137;

General Electric Co. v. Alexander, 2 Cir., 280 F. 852, 855;

Murray v. Detroit Wire Spring Co., 6 Cir., 206 F. 465, 468;

King Ax Co. v. Hubbard, 6 Cir., 97 F. 795, 803;

Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 7 Cir., 90 F.2d 178, 194, 195;

Kawneer Mfg. Co. v. Toledo Plate & Window Glass Co., D.C.Mich., 232 F. 362, 367.

(b) being deeply cut to produce long, narrow, penetrating chisels,

4. The cutting edges of the teeth extending the full width thereof.

Claim 2 differs from claim 4 in that it provides for rows of teeth inclined toward the apex of the cutter so as to extend vertically downward when in contact with the bottom of the hole, having their adjacent sides parallel, and being adapted to interfit. Claim 3 differs from claim 4 in that it provides for rows of teeth on each cutter adapted to interfit with the teeth on the adjacent cutter. Claim 5 differs from claim 4 in that it provides for rows of teeth inclined toward the apex of the cutter so as to extend vertically downward when in contact with the bottom of the hole, and having their adjacent sides approximately parallel. Until the advent of this patent the teeth on the cutters were approximately pyramidal in shape.

The embodiment of the invention illustrated in the patent drawings and disclosed in the specification may be described thusly: It comprises an ordinary rotary drill head with a transverse V-shaped slot. Pins or shafts are mounted in such slot so that they incline downwardly and inwardly from the sides of the slot toward the central axis of the head. Frusto-conical shaped cutters are mounted on the shaft. The teeth are long, narrow, and chisel-shaped and have cutting edges extending the full width thereof. They are arranged in circumferential rows around the face of the cutter. The adjacent sides of the rows are approximately parallel. The rows of teeth are spaced apart to provide ample clearance, and the rows on each cutter are offset relative to the teeth on the adjacent cutter. The teeth extend from the body of the cutter in a direction approximately radial to the center of the cutter but are inclined laterally toward the apex of the cutter, so that as they engage the formation they point vertically downward toward the bottom of the hole.

These large, widely-spaced, long, chisel-shaped teeth so arranged on the cutters penetrate effectively, produce constant and true rotation of the cutters, readily free themselves of adhering material, do not dull quickly, and are long-lived.

Bits embodying the Scott and Scott and Wellensiek patents serve approximately five times as long and drill from three to five times as rapidly as the older bits employing non-cooperating cutters with pyramidal teeth.

The defense to this patent is alleged non-infringement. It is predicated on three contentions with respect to the Williams Company device: (1) that the rows of teeth do not interfit so as to effect self-cleaning; (2) that the rows of teeth do not have their adjacent sides parallel; and (3) that the cutting edges of the teeth are not the full width of the teeth.

This court in Chicago Pneumatic Tool Co. v. Hughes Tool Co., 10 Cir., 97 F.2d 945, held that interfitting teeth is not an element of the claims. We adhere to the views there expressed.

Claims 2 and 3 provide for rows of teeth adapted to interfit, but claims 4 and 5 wholly omit any reference to interfitting teeth. We have heretofore pointed out that certain of the devices manufactured by the Williams Company had interfitting teeth. Each cutter on its device has teeth slightly offset relative to the teeth on the adjacent cutter so they may be adapted to interfit. Omission of interfitting teeth in the devices thereafter manufactured by the Williams Company would not avoid infringement of claims 4 and 5, since interfitting teeth is not an element of those claims.

With respect to the second and third contentions, this court also held in Chicago Pneumatic Tool Co. v. Hughes Tool Co., supra, that the fact the rows of teeth on the cutter were not precisely parallel, if approximately and substantially so, and the fact the teeth were slightly larger at the base than at the cutting edge, would not avoid infringement.

The teeth on the Williams Company device are long, narrow, and chisel-shaped. They are arranged in circumferential rows around the cutter and are widely spaced to provide ample clearance. They are inclined toward the apex of the cutter so they will extend vertically downward when contacting the formation at the bottom of the hole. The rows of teeth on each cutter are offset relative to the rows on the adjacent cutters. While the teeth are slightly larger at the base than at the cutting edge, the cutting edge is substantially the full width of the teeth, and while the adjacent sides of the rows are not precisely parallel, they are approximately and substantially so.

While the relative position of the rows and the size and shape of the teeth go to the essence of the invention, mathematical exactness in those respects is not essential. Substantial identity is sufficient. Cutters with rows of teeth the adjacent sides of

which are approximately parallel, and the teeth of which are approximately as wide at the cutting edge as at the base, and which otherwise respond to the claims, will do the same work in substantially the same way and accomplish substantially the same result as the patented device. We conclude that the Williams Company device embodies the principle of the patent and infringes the claims.

### III.

#### Fletcher Patent No. 1,856,627.

This patent was issued May 3, 1932, on an application filed May 24, 1927. It was allowed by the Board of Appeals of the Patent Office. It relates to roller cutters for rotary drills and is particularly directed to the relative size and location of the teeth on the cutters. Prior to this patent the teeth were arranged in rows longitudinally of the cutters and diminished in size from the base to the apex of the cutters. Due to the fact that the teeth near the apex of the cutters were smaller and all the teeth in each longitudinal row simultaneously came in contact with the formation at the bottom of the hole, the maximum of penetration by the teeth into the formation was not obtained. Furthermore, teeth arranged in longitudinal rows had a tendency to track in the same depressions in the formation each time the cutter revolved, thereby lessening the efficiency of the cutter.

The patented device embraces a head with shafts or pins mounted thereon and approximately frusto-conical shaped cutters mounted on the shafts. The teeth are arranged in circumferential rows around the cutters, but longitudinal of the cutters they are staggered, so that the teeth in each row are out of alignment longitudinally with the teeth in the rows adjacent thereto. Each row of teeth has a lesser number of teeth than the next outer adjacent row. The teeth are chisel-shaped and approximately uniform in size and pitch, except that those in the outer row may be slightly longer than the others.

The trial court found claims 1, 2, and 3 of the patent valid and infringed.

The elements of claim 2 are:

In a roller earth boring drill having a head and two approximately frusto-conical shaped cutters mounted on the forward end thereof to drill the full bottom of the hole, the combination

1. Of cutting teeth secured upon the outer surfaces of said cutters,

2. The teeth being arranged in concentric rows,

3. Each row having a lesser number of teeth than the next outer adjacent row,

4. The teeth in each circumferential row relative to the teeth in its adjacent circumferential rows, being offset longitudinally of the cutter.

Claims 1 and 3 provide for teeth of approximately the same size.

The defenses are invalidity and noninfringement.

By designing a cutter with teeth of approximately equal size and pitch from the base to the apex of the cutter and teeth out of alignment longitudinally, Fletcher overcame the defects we have adverted to in the prior cutters. The teeth, being of approximately equal size, have substantially equal penetration and wearing life. This increases the effectiveness and the useful life of the cutters. The staggered arrangement of the teeth eliminates the tendency of the rows of teeth to track and to bounce from one row to the other as the cutter revolves, and effects uniform cutting of the entire bottom of the hole. It also results in the weight of the drill being brought to bear upon a lesser number of teeth as the rotation of the cutter brings the teeth in contact with the formation, thereby increasing their penetration and effectiveness.

Fletcher thereby produced a smoother operating, faster cutting, more efficient, and longer-lived drill. The improvement was so great that the Hughes Company immediately discarded a large number of costly machines used in manufacturing the older type of cutters and supplanted them with machines adapted to manufacture cutters embodying the Fletcher patent and thereafter incorporated Fletcher's conception into the cutters which it manufactured.

Counsel for the Williams Company assert that the staggered teeth are not a part of Fletcher's conception. They say that his object was to design a cutter with teeth of equal size; that staggered teeth were an accidental incident to the formation of teeth of equal size; that Fletcher did not invent, but merely discovered, the staggered arrangement. It may be that the staggered teeth resulted from empirical effort rather than original conception. Be that as it may, they are a part of Fletcher's ultimate conception, he describes them in his specification and includes them in his claims, and the combination of which they are a constituent

element is new. Fletcher did not merely discover, he invented that combination. [5]

■ A prior patent does not anticipate where changes or modifications, involving the exercise of more than mere mechanical skill, are required to render it capable of performing the functions of the later patent. [6]

■ In order to anticipate a patent for a combination, a prior patent must disclose all the elements of such combination, or their mechanical equivalents, functioning in substantially the same way to produce substantially the same result. [7]

■ A new combination of old elements whereby a new and useful result is obtained, or whereby an old result is obtained in a more facile, economical, and efficient way is patentable, provided the discovery and reduction to practice of the novel combination require greater skill and higher thought than would be expected of an ordinary mechanic trained in the art. [8]

■ Two patents are relied upon as anticipations: Elliott No. 1,393,613, and Layne No. 1,302,058.

The Elliott patent covers a cutter for a tube cleaner to remove scale from the interior of boiler tubes. It is designed for lateral reaming rather than vertical drilling. Each cutter has four sections. All the teeth are not of equal size and pitch. Each row of teeth is not staggered, with relation to its adjacent row, but the teeth on two smaller sections are staggered in relation to the teeth on two larger sections. Elliott staggered the teeth to avoid track-

ing, but in all other respects the problems he was endeavoring to solve bore no relation to the problems at which Fletcher's efforts were directed.

The Layne patent is for a reamer. It is designed primarily to increase the size of the hole, by reaming the side walls thereof, rather than to effect an original bore. It discloses staggered teeth, but not teeth of uniform size and pitch. It is not designed to effect equal wear of teeth. The specification states that when the teeth become too worn for use in the upper portions of the drum they may be advantageously used lower down on the drum. The cutters are made up of disks with detachable teeth clamped between them. They are mounted on shafts supported at both ends. They are not adapted to do heavy work and would not last under heavy strains.

Both of these patents were considered by the Patent Office and were not regarded as anticipations. We are of the opinion that there is nothing in either the Elliott or Layne patents which suggests a solution of the problems toward which Fletcher's efforts were directed and which he successfully solved.

We conclude that the patent is valid.

Hughes Company Exhibit 6, a bit manufactured by the Williams Company, comprises a head and three approximately frusto-conical shaped cutters mounted on the forward end thereof to drill the full bottom of the hole. The cutting teeth are formed upon the outer surfaces of the cutters. They are arranged in concentric rows. On one of the cutters each row of teeth has a lesser number of teeth than the

---

[5] In Diamond Rubber Co. v. Consolidated Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527, the court said:

"A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he has added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor."

[6] Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 36 L.Ed. 658; Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 424, 22 S.Ct. 698, 46 L.Ed. 968; Kelley v. Coe, 69 App.D.C. 202, 99 F.2d 435, 441, 442.

[7] Dow Chemical Co. v. Williams Bros. Well Treating Corp., 10 Cir., 81 F.2d

495, 500, 501, certiorari denied 298 U.S. 690, 56 S.Ct. 960, 80 L.Ed. 1408; Linville v. Milberger, D.C.Kan., 29 F.2d 610, 615; Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 8 Cir., 215 F. 362, 369; J. L. Owens Co. v. Twin City Separator Co., 8 Cir., 168 F. 259, 265; Parks v. Booth, 102 U.S. 96, 104, 26 L.Ed. 54.

[8] Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 442, 446; Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896, 898; Independent Oil Well Cementing Co. v. Halliburton, 10 Cir., 54 F.2d 900, 905, certiorari denied, 286 U.S. 544, 52 S.Ct. 496, 76 L.Ed. 1281.

next outer adjacent row. This is true of the other two cutters, except as to the row at the base of each. On the latter two, due to bevels at the bases thereof, the teeth in the two outer rows can be cut of approximately equal size and number. The teeth in each row on one cutter and on the other two except as to their two outer rows, are offset and out of alignment longitudinally, with relation to the teeth in the adjacent rows. The teeth in the outer row on two of the cutters are slightly longer and have a wider cutting edge than the other teeth thereon, which are approximately of the same size.[9] All of the teeth are so nearly equal in size as to give them substantially equal penetrating quality and wearing life.

We are of the opinion that the mode or means of operation, the functions, and the effects of the patented device and of Exhibit 6 and other like drills manufactured by the Williams Company are substantially identical, and that the patented device and the Williams Company drills will do the same work in substantially the same way and accomplish substantially the same result. We accordingly conclude that Exhibit 6 and other like devices manufactured by the Williams Company infringe claims 1, 2, and 3 of the Fletcher patent.

## IV.

### 1. Scott Patent No. 2,011,084.

This patent was issued on August 13, 1935, on an application filed June 20, 1932. It relates to frusto-conical shaped cutters mounted on a drill head. It is particularly directed to the shaft on which the cutter is mounted and the bearings which hold it on the shaft and on which it travels. Prior to this patent the cutters were mounted on friction bearings. These bearings were in the form of bushings and required constant lubrication. A lubricator was located in the hollow center of the drill stem from which lubricating oil was carried by passages to the bushings and the shaft. The lubricator had to be refilled about every nine hours. This involved pulling the entire drill out of the well and the operation took from two and a half to three hours. Moreover, the bushings did not wear as long as the teeth on the cutters.

The object of the patent in suit is to provide antifriction bearings which will not require lubrication. The problem involved many factors. The cutter shafts are supported at one end only. They incline inwardly at an angle from the horizontal sides of the head, so that there is an upward or vertical thrust on the shaft and a lateral thrust outwardly and upwardly along the shaft. The cutter travels farther and more rapidly on the shaft at the base than at the apex because the circumferences of the shaft and cutter are substantially larger at their bases than their apices. As a result the thrusts are not uniform along the shaft. To obtain effective penetration and cutting by the cutters, a substantial portion of the load of the head and drill stem is superimposed upon the shaft and cutters. An eleven-inch bit carries a normal weight of 11,000 pounds. In a very deep well the weight carried might be as much as 100,000 pounds. The size of the shaft and cutters is limited by the size of the hole. The shaft and cutters must be large enough to carry the weight and withstand the stress of cutting in hard material. Hence, the antifriction bearings must be relatively small in size so that their raceways will not weaken the shaft or the cutters, and yet they must last until the teeth on the cutters are worn out.

The bearings must operate in sand and grit without lubrication, except that originally inserted when the cutters are mounted. Scott's efforts to find a solution of the problem presented in designing an antifriction shaft and bearings for rotary drill cutters covered approximately two years. During that time other antifriction bearings in commercial use carried relatively light loads, ran at high speed, and had long life. In contrast, the bearings Scott was seeking to devise must carry a very heavy load, would travel at relatively slow speed, and could be permitted to wear faster because they would be required to last only the relatively short life of the teeth on the cutters. Other antifriction bearings available were found inadequate to meet the requirements. Many tests were made. It was found that a steel of 55 Rockwell hardness was required. It was necessary to develop a special type of steel, known as "steel head," of sufficient toughness and hardness to stand the stress. The bearing requirements differ at the base and at the apex of the cutter, and at the

---

[9] The specification states that the outer row of teeth adjacent to the base may be slightly longer if desired.

point intermediate thereof. It was found necessary to provide bearings adapted to the existing conditions at those three points.

The device of the patent is illustrated by the following patent drawing:

Three sets of bearings (7, 9, 10) are employed. The shaft is machined with three circumferential half-ball races. One is located near the upper end, one midway, and one near the lower end of the shaft where it is reduced in diameter. The cutters are likewise machined on the inside with three corresponding ball races. The one at the base and the one near the apex are not entirely half, but are open at the inward side, so that the cutter may be slipped over the balls on the shaft. Rows of balls (10, 7) are placed upon the shaft and held in position by a thick, pasty lubricant. The cutter is then slipped over these two rows of balls. An approximately horizontal hole 13 is drilled from the outside of the head to the intermediate ball race. Through this hole the balls 9 are inserted, filling the race. Plug 14 recessed at 15 to form part of the ball race is then inserted in the hole and held in position by a bond of welding material 16. Balls 9 retain the cutter on the shaft. All three sets of bearings take up the vertical thrust. The lateral thrust is largely upon bearing 7 near the lower end of the shaft. This row of bearings, being located between the inner wall of the cutter and the shoulder 12 upon the shaft, can receive this thrust most effectively. The other rows of bearings take up a small part of the lateral thrust. The inner surface of the cutter is spaced slightly from the outer surface of the shaft so that the bearings take up all the wear in use. The bearings are relatively small in size so that the shaft can be made sufficiently large and the wall of the cutter sufficiently thick to withstand the weight and stress imposed upon them. There is sufficient space around the bearings to permit the flushing fluid in the hole to find access to them.

The trial court held claims 6, 7, and 8 of this patent valid and infringed. The elements of claim 6 are

1. A drill head,

2. A downwardly inclined shaft extending integrally therefrom,

3. An outboard antifriction bearing on said shaft adjacent said head,

4. An inner bearing and race therefor to take up the thrust between the ends of the shaft and retain the cutter in position,

5. Means whereby said inner bearings may be inserted into position through the shaft.

The elements of claim 7 are

1. A roller bit having a head,

2. A bearing (shaft)

(a) having a raceway, and

(b) a bore leading transversely into the raceway,

3. A cutter to enclose the bearing, also having a raceway,

4. Ball bearings,

5. A plug,

6. The balls being insertable through the bore into the raceways and the plug being insertable into the bore to hold the balls in the raceways when the bearing is on the head and the cutter is on the bearing to rotatably lock the cutter on the bearing.

The elements of claim 8 are substantially like those of claim 7.

Scott made a very substantial contribution toward the development of a shaft with antifriction bearings for bit cutters which would operate without lubrication. About 2000 bits embodying the conception of the patent were manufactured and used. While they were fairly successful and not inoperative, use disclosed certain weaknesses therein.

### 2. Garfield and Scott Patent No. 2,030,442.

This patent was issued February 11, 1936, on an application filed October 28, 1933. The object of this patent is to improve the device of Scott No. 2,011,084, and overcome the weaknesses therein.

The patented device is illustrated by the following drawings:

Fig. 1

Fig. 2

The head 1 has two downwardly diverging legs 3 providing a wide cleft 4 between them. On the inner face of each leg is a downwardly and inwardly inclined shaft 5. The head is formed with a longitudinal opening 6 of large capacity to allow the passage of flushing fluid downwardly upon cutters 7 mounted on the shafts. The cutter shafts are approximately cylindrical, but are tapered slightly toward the end and are stepped down at the end to form a pilot pin 8 of small diameter and integral with the shaft. The shaft may be slightly recessed to form a raceway as shown at 9 in Figure 1 or may be left plain as shown at 9' in Figure 2. A corresponding raceway is machined in the cutter shell. A half-ball raceway is machined in the cutter shell at 11 and a half-ball raceway is machined in the shaft at 10. Outboard roller bearings are inserted at 9 and 9'. A horizontal opening 13 is bored from the head to the ball raceway. Through this opening the balls are inserted into the raceway. The opening is then filled by a plug 14 and held in place by a bond of welding material 16. The interior of the cutter shell is recessed to fit the shaft loosely so that the flushing fluid may enter about the bearings. A hole 18 at the apex of the cutter may be provided to facilitate the fluid circulation. When the raceway for the roller bearings is countersunk on the shaft, the rollers fit closely therein and have no longitudinal play.

In Figure 1 embodiment the interior cutter face is cut away at 19 adjacent to the end of the roller raceway, eliminating contact with the end of the roller bearings and any thrust longitudinally of the shaft on the roller bearings. That thrust is taken up by the ball bearings and the other thrusts are taken up by the roller bearings and the pilot pin 8. In Figure 2 embodiment the shaft is not countersunk for the roller bearings. There being space between the upper end of the roller bearings and the shoulder on the shaft, the roller bearings may have longitudinal sliding movement on the shaft. This also eliminates any thrust on the roller bearings longitudinally on the shaft. Thus, in both embodiments the thrust is divided and the heaviest load is carried by the roller bearings located where the speed of the cutter is greatest. The ball bearings also serve as a locking device to hold the cutter on the shaft, and are located at the most protected position, eliminating danger of their being worn away and permitting the cutter to come off the shaft. Since the speed of rotation of the cutter at the lower end of the shaft is slower, and because the apex of the cutter is at all times in close proximity to the flushing fluid, which will overcome heat from friction, a ball bearing at the lower end of the cutter is not required, and a plain bearing in the form of a pilot pin is adequate. In the patented device the rolling action of the cutter is balanced so that uniform wear will take place and the bearings will last until the teeth on the cutter are worn out. The Garfield and Scott device overcame the weaknesses that developed in the Scott device and effected a very substantial improvement in drilling bits. The bearings operated successfully and wore longer than the teeth on the cutters and required no lubrication other than that effected by the flushing fluid. As compared with bits employing the older friction type shaft and bearings, the drilling speed was increased from two to three times, and the life of the cutters approximately three times.

The trial court held claims 1 to 15, inclusive, of this patent valid and infringed.

The elements of claim 3 are

In a roller bit

1. A head having a cutter recess,

2. The opposite walls of the recess extending downwardly and outwardly from the longitudinal axis of the head,

3. Bearings (shafts) projecting downwardly and inwardly into said recess from the walls,

4. Each bearing having a roller raceway adjacent its wall of the recess and a ball raceway between the roller raceway and the end of the bearing,

5. Roller cutters enclosing the bearings,

6. Each of the cutters having a roller raceway and a ball raceway,

7. Rollers in the roller raceways,

8. Each of the bearings having a bore leading transversely into its ball raceway,

9. Balls insertable through said bores into the ball raceways,

10. Plugs insertable into the bores to hold the balls in the ball raceways,

11. The cutters being rotatably locked on the bearings by the balls.

While the other claims differ in certain particulars, all include the following elements: Shafts having roller raceways and ball raceways, the roller raceway being located near the upper end and the ball raceway near the middle of the shaft; cutters on the shafts having corresponding roller raceways and ball raceways, rollers in the roller raceways and balls in the ball raceways; and cutters rotatably locked on the shaft by the balls.

### 3. The Defenses.

The defenses to patents Nos. 2,011,084 and 2,030,442 are invalidity and noninfringement.

(a) *Invalidity.* In order for a prior patent to anticipate it must be complete and capable of operation.[10]

A prior patent which fails to solve the problem toward which the inventor's efforts are directed does not anticipate a subsequent patent which successfully solves the problem and effectually accomplishes the desired result.[11]

That others skilled in an art and working in a given field many times endeavored but failed to discover the principle and mode of operation of a new and useful improvement is strongly indicative that he, who thereafter discovered the principle of such improvement and designed a complete and operative device embodying such principle, did more than what would be obvious to a mechanic skilled in the art and that his conception resulted from the exercise of inventive genius.[12]

In the light of these principles and those adverted to in our discussion of Fletcher patent No. 1,856,627, we proceed to a consideration of the patents relied upon as anticipations.

The Hughes patent No. 959,539, which issued May 31, 1910, shows a frusto-conical shaped cutter mounted on a shaft. It discloses but one set of ball bearings, the principal function of which is to retain the cutter on the shaft. Friction is not substantially eliminated and the device is not designed to work without lubrication. It embraces lubricating means and a number of its claims are directed thereto. It has no outboard antifriction bearings at the upper ends of the shafts corresponding to the ball bearings of Scott or the roller bearings of Garfield and Scott. The balls are not and could not be inserted into their raceway through a bore as in Scott and Garfield and Scott.

Pickin patent No. 1,302,967, issued May 6, 1919. It comprises a head with four spindles mounted in sockets in the head. Two of the spindles turn inwardly at the lower end and two turn outwardly at the lower end to form cylindrical shafts or bearings. The shafts are not reduced in size toward the lower ends as in Scott and Garfield and Scott. The four cutters mounted on the shafts are ring-shaped, or cylindrical in form, except for a slight bevel at their lower ends. They rotate on three sets of bearings—ball bearings at the upper and lower ends of the shaft and roller bearings intermediate thereof. The

---

10 De Simone v. R. H. Macy & Co., 2 Cir., 57 F.2d 179, 180;

Diamond Patent Co. v. S. E. Carr Co., 9 Cir., 217 F. 400, 405;

Robinson on Patents, Vol. 1, Sec. 335.

11 Farmers' Mfg. Co. v. Spruks Mfg. Co., 4 Cir., 127 F. 691, 695;

Consolidated Window Glass Co. v. Window Glass Machine Co., 3 Cir., 261 F. 362, 368;

Whiteley v. Swayne, 7 Wall. 685, 687, 74 U.S. 685, 19 L.Ed. 199;

Babcock & Wilcox Co. v. Springfield Boiler Co., 2 Cir., 16 F.2d 964, 969.

12 Stearns-Roger Mfg. Co. v. Ruth, 10 Cir., 62 F.2d 442, 447;

New York Scaffolding Co. v. Whitney, 8 Cir., 224 F. 452, 457;

Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034.

three sets of bearings are positioned in a line, which is parallel with the sides of the shaft and the inner cylindrical wall of the cutter. Nothing in this patent suggests a solution of the problem of taking care of the vertical and lateral thrusts, successfully solved by Scott and Garfield and Scott.

Fletcher patent No. 1,918,902 was applied for September 12, 1931, and issued July 18, 1933. It discloses a row of relatively large balls positioned near the base of the cutter and the upper end of the shaft to support part of the load and retain the cutter on the shaft, and a single ball at the lower end of the shaft to carry part of the load. The balls at the upper end of the shaft travel in a raceway formed in the shaft and the cutter. They are inserted through a radial opening in the cutter. The opening is closed by a threaded plug with a transverse groove on its inner face adapted to conform to the raceway in the cutter. Tests disclosed that the plug would break out and permit the balls to escape, that the apex of the cutter, turning on the single ball, would shift and increase the stress, that the large ball race weakened the cutter shell, and that these defects caused the cutters to break. This caused manufacture of the patented device to be abandoned.

While it discloses use of the flushing fluid to cool and lubricate the bearings, it does not teach effective splitting of the thrusts by positioning the bearings at three appropriate locations on the shaft nor holding the shaft in position by the intermediate bearings in the most protected position as in Scott and Garfield and Scott.

Childs patent No. 1,779,587 was issued October 28, 1930. It discloses a single row of balls in combination with a bushing. The shaft is recessed inwardly from the middle to the lower end, forming a spindle over which the smaller end of the cutter fits and upon which it revolves. The balls are inserted by means of a longitudinal bore through the center of the shaft and a transverse bore leading from the longitudinal bore to the raceway. A smaller third bore intersects the transverse bore and a removable retaining pin is inserted therein to hold the balls in place. Because of the location of this third bore the balls have to be inserted before the shaft is mounted on the head. The bores form a grease chamber and are filled with grease to provide lubrication for the balls. The specification refers to the balls and the raceway only as a means for retaining the cutter on the shaft. They are located at the upper end of the shaft where the thrust is heavy. The thrusts are carried by bushings. The shaft is not integral of the head. Means are provided for attaching the assembled shaft and cutter to the head and removing the same therefrom. In contrast, in Scott and Garfield and Scott the shaft is integral of the head and the cutters are mounted directly on to the shaft. Bushings and lubrication by oil and grease are eliminated. A plurality of antifriction bearings are employed to split the thrust, carry the load, and retain the cutter on the shaft. The intermediate row of ball bearings, which carries part of the thrust, and also locks the cutter on the shaft, is located in the most protected position, and where the thrust is less than at the base. Scott's bearings wear as long as the teeth on the cutters. Hence, no provision for detaching the cutter and shaft from the head is necessary. There is no proof of any practical use of the Childs device. Claim 6 of Scott was allowed over Childs' patent.

Scott and Garfield and Scott succeeded where others failed. Scott conceived a new combination of old elements whereby a new and useful result is obtained. Garfield and Scott conceived a new combination of old elements whereby an old result is obtained in a more facile, economical, and efficient way than in any prior conception or device.

With respect to claims 7 and 8 of Scott patent No. 2,011,084, it will be observed that they cover only an intermediate ball race and balls to hold the cutter on the shaft. While Scott chose a more advantageous location for the balls and ball race, we do not think his conception covered by claims 7 and 8, in the light of the prior art, amounted to invention.

We conclude, therefore, that claims 7 and 8 of Scott patent No. 2,011,084 are invalid for want of invention, and that claim 6 of that patent and the claims in suit of Garfield and Scott are valid.

(b) *Infringement.* Claims 6, 7, and 8 of Scott patent No. 2,011,084 and claims 1 to 15, inclusive, of the Garfield and Scott patent read squarely upon the Williams Company structure. Indeed, the designer of the Williams Company structure admitted that he followed the teachings of the Garfield and Scott patent in designing the shaft and bearings. Coun-

512

sel for the Williams Company deny infringement of claim 6 of Scott No. 2,011,-084 on the ground that claim embraces cutter shafts extending integrally from the head, but the proof shows that the shafts on the Williams Company bits are welded on to the head and are thereby made to extend integrally therefrom. We conclude that claim 6 of Scott patent No. 2,011,084 and the claims in suit of Garfield and Scott are infringed.

Rotary drills embodying the conceptions of the patents in suit have completely superseded the older drills and greatly increased the use of the rotary drill. At the time of the trial Hughes Company was manufacturing 10,000 of these drills per month, and selling and shipping them for use in oil fields throughout the world. Each patent marked a distinct step forward, increasing the efficiency, the speed, and the wearing life of the drills. Each constitutes a new combination of old elements whereby a new and useful result is obtained or whereby an old result is obtained in a more facile, economical, and efficient way than in any prior conception or device. The discovery and reduction to practice of these novel combinations required greater skill and higher thought than would be expected of an ordinary mechanic trained in the art, and resulted from the exercise of inventive genius.

The Williams Company device appropriates the principles of these patents. Its device and the device embodying the patents in suit will do the same work in substantially the same way and accomplish substantially the same result.

The judgment is modified so as to adjudge claims 7 and 8 of Scott patent No. 2,011,084 invalid for want of invention, and as so modified is affirmed.

Let the costs be assessed against the Williams Company.