**UNITED STATES GYPSUM COMPANY,**
a corporation, Plaintiff,

v.

**ROCK WOOL INSULATING COMPANY,**
a corporation, et al., Defendants.

Joseph M. Brennan, Intervenor.

Civ. No. 6192.

United States District Court
D. Colorado.

Dec. 14, 1962.

Arthur A. Olson, Arthur B. Seibold, Jr., and Ralph E. Church, Jr., of Olson,

Mecklenburger, von Holst, Pendleton & Neuman, Chicago, Ill., William Griffith Edwards, of McGrew & Edwards, Denver, Colo., for plaintiff.

Horace B. Van Valkenburgh and Gary D. Fields, Denver, Colo., for defendants, except intervenor.

Joseph M. Brennan, Denver, Colo., intervenor, pro se.

KERR, District Judge (assigned).

This is a patent infringement case brought pursuant to 35 U.S.C. § 281, and 28 U.S.C. § 1338(a). The patents in suit involve the methods and apparatus to produce mineral wool. Defendants deny infringement and assert the invalidity of plaintiff's patents.

Plaintiff, United States Gypsum Company, as assignee and owner of the patents No. 2,587,710 and No. 2,646,593 issued to Richard M. Downey brought this action for damages and injunction relief against Rock Wool Insulating Company and Herbert F. Korholz. The additional defendants were brought in when Rock Wool Insulating Company merged into MPM Investment Company and when the latter company merged into Better Industries, Inc. MPM Investment Company's two mineral wool production subsidiaries, Texas Rock Wool Corporation and Mineral Wood Insulations Co., became divisions of Better Industries, Inc. Intervenor Joseph M. Brennan's sole interest in this controversy is that of a stockholder of Rock Wool Insulating Company, who is attempting to ascertain the state of affairs of said company. It was agreed by all the parties that the interest of said intervenor would not be considered in this present suit. Consequently, all references to defendants herein exclude Intervenor, Joseph M. Brennan.

■ I shall first consider the issue of the validity of plaintiff's patents. Sears, Roebuck & Co. et al. v. Jones et al., 10 Cir., 308 F.2d 705 (1962). Plaintiff is aided by the statutory presumption that a "patent shall be presumed valid". 35 U.S.C. § 282. Defendants have the burden to overcome that presumption by strong, clear, cogent and convincing evidence. Radio Corporation of America et al. v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 55 S.Ct. 928, 79 L.Ed. 163 (1934); Insul-Wool Insulation Corporation v. Home Insulation, Inc., 10 Cir., 176 F.2d 502 (1949); Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896 (1931); Moon et al. v. Cabot Shops, Inc. et al., 9 Cir., 270 F.2d 539 (1959).

■ Defendants assert five principal grounds for the alleged invalidity of the patents: they aver file wrapper estoppel; they claim that the second Downey patent, No. 2,646,593, is invalid on the principle of double patenting; they attempt to show that the method claims of the patents are invalid as reciting merely the function of the apparatus; they contend that certain claims in the second patent are invalid under the rule against patenting old combinations; and, finally, they assail the patentability of the patents over the prior art, in view of prior art not considered by the patent office. In general, defendants challenge that Richard M. Downey did not invent anything that entitled him to the protection of a patent.

Downey's patents relate to the method and apparatus for producing mineral wool. The patentability of the Downey inventions is evidenced by their impact on the mineral wool production industry.

Prior to the inventions by Downey, mineral wool was produced entirely by a method of fiberization employing units known as blow caps. This method consisted of a cupola in which the slag or rock was melted; a slag trough into which the melt was discharged from the cupola; blow caps; and a collecting chamber. The blow caps were adjustable but they did not rotate.

An insignificant improvement in this blow cap method was effected by using V-troughs or dividers to divide the volume of slag into two or more streams. These molten slag streams fell into an area where numerous small stream jets were directed against the falling slag

streams. The arrangement of the steam orifices and the force of the steam itself created an area of low pressure which tended to hold the falling stream in a temporary position while the edges of the same slag streams were shredded by the velocity of the steam blast.

The consensus of the testimony was that the quality of the fiber produced in this manner was inferior. A large portion of the slag stream was not converted into fiber, but remained in solid small spheres of solidified slag, known as shot. A very objectionable product of the entire industry, this high shot content represented considerable material lost. The blow cap produced fibers which were short and which allowed much to be desired in diameter control. The witnesses were in accord in their conclusion that the blow cap operation was undesirable and that it was evident that progress was needed in the development of a better fiber, both from a quality and from an economic standpoint.

Under the auspices of plaintiff, experiments were conducted and research developed. The Armour Research Foundation and the Massachusetts Institute of Technology also participated in such research. The services of Mr. Richard M. Downey were engaged to find some way to obsolete the blow cap method of producing mineral wool. According to the record, Mr. Downey was only one of many people who were endeavoring to find some way economically to fiberize slag. Plaintiff's works manager was alarmed at the competitive interest in the race for improvement. He was concerned about the success and economic health of the new and modern plant in Weston, Ontario. Such was the industrial atmosphere in the Fall of 1949 when Mr. Downey's new method and apparatus were invented.

Mr. Rosier, plaintiff's plant manager of the plant in Weston, Ontario, acclaimed Downey's invention as "manna from heaven". He testified that the equipment designed by Downey allowed for controlling the type of fiber that was made and there was greater yield of superior fiber per pound of slag than in the old process. The Downey apparatus consisted of a cylindrical rotor or rotary divider mounted and rotating on a horizontal shaft powered so that it would rotate at varying speeds from 600 to 1500 RPM. The rotor was twelve to fourteen inches in diameter. One end of the rotor was hollowed out cup shape or like a dishpan. The slag was fed from the cupola into the cup forming a continuous annulus or reservoir of melt all around on the inside of the rotor retaining it for a sufficient time for it to pick up the momentum from the rotor. It proceeded from the annulus over the lip of the rotor in many small streams. Back of the lip of the rotor was an annular steam ring which was drilled by a series of holes all around so that the small streams of melt which came off tangentially from the lip of the rotor would be intercepted by a blast of steam from the annular steam ring or annular blow nozzle to attenuate these streams into fiber. The fiber entered the blow room or collecting chamber through a circular orifice in the baffle plate. Downey's apparatus contained also a "slug trap" whereby any of the small streamlets which were in particles that were too large or too cold to make fiber were flung through the steam jets by virtue of their higher kinetic energy. These particles were carried out at an angle greater than the wool and were caught in a trap area so they did not get into the finished product.

From its inception, this equipment which was designed by Downey and built in Weston, Ontario, produced mineral wool successfully. The rotor was a solid block of steel with no water cooling in the rotor or shaft. This was his basic invention embodied in Patent No. 2,646,-593.

After some production using Downey's new apparatus and methods it was discovered that the life of the rotor was not as long as might be desired and rotors were relatively expensive to manufacture. For these reasons Mr. Downey proceeded to find a method to cool the rotors by use of water. He developed a hollow shaft

with a small tube inside and a hollow rotor so that water could be conveyed through it. The water proceeded through the tube into the rotor, and then flowed back through the hollow shaft. A rotary union was developed at the end of the shaft to connect a water line up to a rotating body to get the water passage. The water cooled rotors were installed and operated commercially early in 1950. This improvement is disclosed in and covered by Downey patent No. 2,587,710.

The undisputed evidence proved beyond a doubt that the Downey apparatus and methods made a great impression on the mineral wool producing industry. A summary of the advantages realized from the operation of the Downey apparatus and method over the old blow cap method showed that there were several points of control, such as the speed of rotation and the steam pressure; the type of fiber produced could be changed so that special types of wool could be produced; the fiber produced off this equipment was longer in nature and smaller in diameter, making the wool more flexible and less easily broken. Another advantage was the slug trap which caught the larger beads segregating them from the finished wool product. A lighter density batt resulted from this new operation, freight savings were greater, more efficient insulation was produced, and the plant was able to increase the number of bags of granulated wool from eighty to one hundred and twenty, which was a fifty percent improvement in yield.

Defendants failed to disprove that the widely recognized need for an improved product and an economical method of production was satisfied by the invention of the Downey apparatus and methods. Their references to numerous prior art patents evidence the failures in prior attempts to solve the problems. Ric-Wil Co. v. E. B. Kaiser Co., 7 Cir., 179 F.2d 401 (1950). Prior to 1949 practically every mineral wool producing plant was using blow caps. There was evidence that the blow cap method was the only commercially known method. Some years later, after the innovation of the Downey invention, the blow cap method was no longer the standard method of production. The disadvantages and problems of the old method and the desperate need for improvement were so generally recognized that industry-wide research and experiments were engaged in to rectify the situation. Until the Downey inventions such efforts had been unsuccessful. It was Downey who first made the discovery which stabilized the industry and put the plants on a competitively sound foundation. Expanded Metal Company v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1909); Cold Metal Process Company et al. v. Republic Steel Corporation, 6 Cir., 233 F.2d 828 (1956), cert. denied 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86.

Further evidence of the validity of the Downey patents was the acquiescence in their validity and the adoption of the Downey apparatus and methods. Between 1953 and 1958 royalty payments received from the licensees under the Downey patents amounted to $1,200,000.00. Obviously the licensees recognized the validity of the patents in suit as royalties would not have been paid if the manufacturers in the industry believed that they could adopt the Downey apparatus and methods free of the patents. Harris et al. v. National Machine Works, Inc., 10 Cir., 171 F.2d 85 (1948), cert. denied 336 U.S. 905, 69 S.Ct. 491, 93 L.Ed. 1070; Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999 (1938).

In their attempt to invalidate plaintiff's patents, defendants relied on forty-seven prior art patents. They thereby succeeded only in evidencing the weakness of their own contentions. Reynolds et al. v. Whitin Mach. Works, 4 Cir., 167 F.2d 78 (1948), cert. denied 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768. These prior patents failed to solve the problem and to revolutionize the industry. It cannot be successfully contended now that they anticipated the Downey patents. Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500 (1940), and cases cited therein.

5

Much of the evidence of prior art patents upon which defendants relied to prove anticipation of the Downey patents admittedly did not solve the problem of producing more and better quality fiber and of reducing the waste. Defendants resorted even to an unsuccessful and abandoned experiment by Robert M. House. I am reminded of the "excursions into the boneyard of failures * * *". Reynolds et al. v. Whitin Mach. Works, supra.

Defendants attempted to escape the charge of infringement by collecting and piecing together several elements from a collection of patents. I am not impressed with such attempted proof of invalidity. Imhaeuser v. Buerk, 101 U.S. 647, 25 L.Ed. 945 (1879); Harris et al. v. National Machine Works, Inc., supra; Skinner Bros. Belting Co. v. Oil Well Improvements Co., 10 Cir., 54 F.2d 896 (1931).

The double patenting argument which defendants advanced is unmeritorious. There is no double patenting in the Downey patents. The basic Downey patent involves the method and apparatus for fiberizing molten material. Application for a patent was filed by Richard M. Downey on May 1, 1950, in the Canadian Patent Office, and on November 4, 1950, it was filed in the United States Patent Office. Interference was initiated involving an application by Robert M. House, which was ultimately terminated by House conceding priority to Downey. After entry of judgment by the Patent Office in favor of Downey the general Patent No. 2,646,593 was issued July 28, 1953.

In the interim, on November 1, 1951, Downey filed his application for the improvement patent, No. 2,587,710, which was issued March 4, 1952. This patent discloses water cooled apparatus and process for making mineral wool.

■ Defendants infer contrivance on the part of Downey to unduly extend the life of his patent. This is unwarranted. The interference and delay were not occasioned by the patentee. It is well established that the offense of double patenting does not invalidate a patent where the basic invention is applied for before, but the patent issued after, the filing and issuance of an intervening application for an improvement patent. Amdur, Patent Law and Practice (1935 Ed.), page 367; Fehr et al. v. Activated Sludge, Inc., 7 Cir., 84 F.2d 948 (1936).

■ Downey's first application was for the generic invention. It contained drawings, disclosures and claims different from the improvement patent filed later. It has been frequently held that "patents of prior date issued to the patentee, if in the nature of improvements of the original invention, are subordinate to the broad scope of the first conception." Electric Storage Battery Co. v. Buffalo Electric Carriage Co., 117 F. 314, 315 (C.C.W.D.N.Y.1902), aff'd 2 Cir., 120 F. 672 (1903), cert. denied, 188 U.S. 741, 23 S.Ct. 849, 47 L.Ed. 678. The rule in the case of Miller v. Eagle Manufacturing Company, 151 U.S. 186, 14 S. Ct. 310, 38 L.Ed. 121 (1894), is of no solace to defendants as the two patents in that case were for the same invention, a fact situation not present in the instant case.

■ Defendants' attack on the validity of the patents on the ground that the method claims of each patent are invalid as reciting merely the function of the apparatus is unwarranted in the light of the evidence. Mr. Downey invented not only a new and different method, but also the apparatus for producing mineral wool. The claims in the patents are distinctively for the "device for converting molten material into fibers", and for the "method of forming mineral wool". The inclusion in the same patent of method claims and apparatus claims does not attest to the invalidity of the patent. General Tire & Rubber Co. v. Fisk Rubber Corporation, 6 Cir., 104 F.2d 740 (1939).

I have carefully considered all the objections and defenses made by defendants concerning the patentability and invalidity of Downey's patents. It is unnecessary to relate every detail urged. After considering defendants' many defenses

and arguments, I am persuaded that the evidence and the applicable law conclusively establish that defendants did not overcome the presumption of the validity of the patents in suit. The proof confirms the claim that Downey was the first inventor of the method of producing mineral wool involving a rotary divider and an annular steam ring, as well as an apparatus and method for cooling the rotors and maintaining them at the proper operating temperature by means of water circulation. There is no dispute that plaintiff is the assignee and the present owner of the Downey patents.

Plaintiff claims that the defendants knowingly, deliberately and defiantly copied the patented Downey apparatus and used it from on or about November 1, 1954, to the present time. There are two pertinent periods of time: from about November 1, 1954, to the summer or fall of 1957. During these years defendants used the apparatus ordered from and installed by the Rock Wool Engineering & Equipment Company, and also the apparatus made by the Gobatti Manufacturing Company of Pueblo, Colorado. Secondly, the period after the summer or fall of 1957 when defendants used the so-called Corsentino apparatus.

It is the contention of plaintiff that infringement is effected by the fact that defendants purchased a Downey apparatus, and had it copied by Gobatti, thereby using the patented devices between 1954–1957; and that after 1957 they used the Corsentino device which is so nearly identical to the Downey devices as to amount to an imitation and infringement thereof. In support of its accusation, plaintiff introduced competent evidence comparing the characteristics of the apparatus used by defendant with the operation and functions of, and the results effected by the Downey patented apparatus and methods. This comparison shows that defendants' equipment and methods are substantially identical with Downey's device; that they work in the same manner; and that they accomplish substantially the same results. Williams Iron Works Co. v. Hughes Tool Co., 10 Cir.,

109 F.2d 500, 503 (1940), and cases cited therein.

The testimony of the supervisor of the defendants' Pueblo plant explained the chronology of events. In 1952 when Mr. Korholz was president of Rock Wool Insulating Company the plant was using the blow cap method of producing rock wool. In the fall of 1954, prior to November 14, 1954, defendants purchased their first spinning apparatus, including the spinning wheel and rotor from the Rock Wool Engineering Equipment Company in Indiana. This company was the manufacturer of the Downey apparatus for plaintiff and its licensees. Mr. Overman, the president of Rock Wool Engineering Equipment went to Pueblo to supervise the installation of the apparatus.

A second spinner was installed in the defendants' Pueblo plant around January 1955. The then plant manager testified that the parts for this second machine were made and supplied by Gobatti Manufacturing Company located in the vicinity of Pueblo, Colorado. Mr. Gobatti went to the plant, took the measurements from the spinning apparatus that had been installed under Mr. Overman's direction and duplicated it. On this apparatus defendants made slight changes on the concave or face side of the wheel by making a kind of perimeter design.

The record leaves no doubt that defendants infringed plaintiff's patents from about November 1, 1954, to the summer or fall of 1957; that the defendants used the apparatus and methods patented by Downey by the purchase of the apparatus from Rock Wool Engineering and Equipment Company and by the Gobatti-constructed imitation of said patented apparatus.

In the fourth week of the trial, after the testimony and exhibits in this regard had been made of record, some of it having been elicited in depositions, counsel for the defendants admitted their infringement during this 1955–1957 period. They admitted that the claims of the patents in suit read on the 1955–1957 spinners. Defendants' counsel stated

that the Court need not devote its time to considering the question of infringement during the 1955–1957 period. Counsel for defendants agreed that the only question for the Court to decide was the validity or invalidity of the Downey patents and the Corsentino head which was used after September or October of 1957.

I turn then to the Corsentino apparatus. Before June 1956 Joseph Corsentino worked for the Colorado Insulating Company, and from June 1956 to June 1957 he worked for the Texas Rock Wool Company. During this time defendant Korholz was also connected with these companies. Mr. Corsentino was employed by defendants at the Pueblo, Colorado, plant from June 1, 1957, until February 1, 1960. In July 1957 defendant Rock Wool Insulating Company at Pueblo started using the so-called Corsentino head in its regular production apparatus. Mr. Corsentino filed his application for his patent on August 24, 1959, after the present suit was commenced on October 7, 1958. Defendants contend that the Corsentino apparatus does not infringe the Downey patent because it is a new and independent invention by Corsentino.

■■ Contrary to defendants' position, their expert witness testified that the shafts, rotors, horizontal steam rings, everything in the two apparatus are comparable, the only change being the grooves in a shallow-faced rotor which permit the development of a wide "fire band" on a relatively vertical face. He testified that this fire band was a major contribution to the industry. He did not, however, explain what this contribution amounted to. The record does not support his unauthenticated claim. Instead, the record shows that any differences between Downey's invention and the Corsentino machine were slight and immaterial. Immaterial differences in Corsentino's machine do not involve an invention. Infringement is not avoided by minor changes or variations of an existing patent. Graver Tank & Mfg. Co.,

Inc. et al. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The record also shows that the elements in the Corsentino patent find their counterpart in the Downey patents. The fire band appears in the Downey patents under different terminology. The defendants' apparatus has the cylindrical rotor which is hollowed out or cup shaped, with one closed end and one open end. It is fed by slag from a cupola through a slag trough, down close to the bottom of the rotor. It is surrounded by an annular steam ring exactly the same as the Downey apparatus. Clearly there is substantial identity between the plaintiff's apparatus and methods and the accused apparatus to constitute infringement. It comes squarely within the oft-quoted principle enunciated in Sanitary Refrigerator Company v. Winters et al., 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147 (1929): " * * * if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." See also Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500 (1940), and cases cited therein.

■ Neither does the issuance of the patent to Corsentino rescue defendants from the charge of infringement. The question of infringement is not foreclosed by the patenting procedure. Sanitary Refrigerator Company v. Winters et al., supra. In Herman v. Youngstown Car Mfg. Co., 6 Cir., 191 F. 579, 584–585 (1911), it is said that "A patent is not the grant of a right to make or use or sell. * * * It grants only the right to exclude others. * * * Patentable difference does not of itself tend to negative infringement."

For the foregoing reasons I hold that the Downey patents, No. 2,587,710 and No. 2,646,593 are valid and infringed.

■ The irrefutable evidence is that defendants wilfully and deliberately engaged in infringement practices with the intent to deceive and defraud plaintiff.

Notice of infringement dated March 3, 1955, was sent to the Rock Wool Insulating Company. In July 1956 Mr. Korholz conceded the use of the Downey-type apparatus and methods at the Pueblo plant covered by the Downey patents. He promised that defendants would cease and desist using the Downey type spinners. In October 1956 the presidents of plaintiff and defendant companies again met and Korholz again admitted using the Downey type spinner at the Pueblo plant. He explained, however, that it was only a temporary measure due to an emergency situation. Following this meeting defendants condescended to a subterfuge which attests to their bad faith and malevolent posture respecting the Downey patents. Immediately prior to the inspection visit of plaintiff's president to the defendants' Pueblo plant, Korholz ordered the dismantling and removal of the Downey spinners from the plant. One of the offending spinners was hidden in the slag pit and the other was put in the junk pile. The Richardson spinner was substituted on the cupola platform but was not hooked up nor operated. After the visitors from United States Gypsum left, the Richardson apparatus was replaced by the Downey spinners. Such conduct was not defended at the trial nor denied by defendants, nor was it ever satisfactorily explained or justified.

Defendants' stratagem from October or November of 1954, and continuing to date, manifested their intent to appropriate the Downey invention in complete disrespect of its rights under the patent.

Prior to commencing this suit plaintiff and defendants corresponded frequently and conferred concerning the charge of infringement. Investigations were required of plaintiff prior to giving notice of infringement in 1955. Suit was commenced on October 7, 1958. Extensive preparations for trial were made to establish the charge of infringement. Several pretrial conferences were held. All this assiduity to protect the patents against infringement, and on March 1, 1962, in the fourth week of the trial, defendants admitted that the spinners, which they had concealed from plaintiff, infringed plaintiff's patents. Protracted, vexatious and expensive litigation is the history of this case.

From what I have said I hold that defendants' counterclaim for declaratory judgment should be dismissed; that plaintiff is the owner of United States Letters Patent No. 2,587,710 and No. 2,646,593 and has the right to sue for infringement thereof; that plaintiff's patents No. 2,587,710 and No. 2,646,593 are valid; that the defendants Rock Wool Insulating Company and Herbert F. Korholz have infringed the aforesaid patents through the use by Rock Wool Insulating Company and by the use of the so-called Corsentino rotary apparatus; that the defendants MPM Investment Company and Herbert F. Korholz, who controls said company, have likewise infringed said patents; that defendants Better Industries, Inc., and Herbert F. Korholz have infringed said patents by the use thereof of the so-called Corsentino rotary apparatus; that plaintiff is entitled to an injunction enjoining the defendants from further infringement of said patents; that plaintiff is entitled to an accounting of damages sustained by said infringement and to judgment for damages, including reasonable attorneys' fees, costs and interest, to be determined after the accounting is filed with the Clerk of the United States District Court for the District of Colorado pursuant to judgment to be entered herein. The Court's findings of fact and conclusions of law are submitted herewith. Plaintiff will submit proposed Judgment within fifteen days from this date in conformity with this memorandum.